## LOUISIANA ET AL. *v.* UNITED STATES.

No. 67.   Argued January 26–27, 1965.—Decided March 8, 1965.

146

*Harry J. Kron, Jr.,* Assistant Attorney General of Louisiana, argued the cause for appellants. With him on the brief were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *Carroll Buck,* First Assistant Attorney General.

*Louis F. Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Marshall, Harold H. Greene* and *David Rubin.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Pursuant to authority granted in 42 U. S. C. § 1971 (c) (1958 ed., Supp. V), the Attorney General brought this action on behalf of the United States in the United States District Court for the Eastern District of Louisiana against the State of Louisiana, the three members of the State Board of Registration, and the Director-Secretary of the Board. The complaint charged that the defendants by following and enforcing unconstitutional state laws had been denying and unless restrained by the court would continue to deny Negro citizens of Louisiana the right to vote, in violation of 42 U. S. C. § 1971 (a) (1958 ed.) [1] and the Fourteenth and Fifteenth Amendments to the United States Constitution. The case was tried and after submission of evidence,[2] the three-judge District Court, convened pursuant to 28 U. S. C. § 2281 (1958 ed.), gave judgment for the United States. 225 F. Supp. 353. The State and the other defendants appealed, and we noted probable jurisdiction. 377 U. S. 987.

The complaint alleged, and the District Court found, that beginning with the adoption of the Louisiana Constitution of 1898, when approximately 44% of all the registered voters in the State were Negroes, the State had put into effect a successful policy of denying Negro citizens the right to vote because of their race. The 1898

---

[1] "All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." 16 Stat. 140, 42 U. S. C. § 1971 (a) (1958 ed.).

[2] The appellants did not present any evidence. By stipulation all the Government's evidence was presented in written form.

constitution adopted what was known as a "grandfather clause," which imposed burdensome requirements for registration thereafter but exempted from these future requirements any person who had been entitled to vote before January 1, 1867, or who was the son or grandson of such a person.[3]  Such a transparent expedient for disfranchising Negroes, whose ancestors had been slaves until 1863 and not entitled to vote in Louisiana before 1867,[4] was held unconstitutional in 1915 as a violation of the Fifteenth Amendment, in a case involving a similar Oklahoma constitutional provision.  *Guinn* v. *United States,* 238 U. S. 347.  Soon after that decision Louisiana, in 1921, adopted a new constitution replacing the repudiated "grandfather clause" with what the complaint calls an "interpretation test," which required that an applicant for registration be able to "give a reasonable interpretation" of any clause in the Louisiana Constitution or the Constitution of the United States.[5]  From the adoption of the 1921 interpretation test until 1944, the District Court's opinion stated, the percentage of registered voters in Louisiana who were Negroes never exceeded one percent.  Prior to 1944 Negro interest in voting in Louisiana had been slight, largely because the State's white primary law kept Negroes from voting in the Democratic Party primary election, the only election that mattered in the political climate of that State.  In 1944, however, this Court invalidated the substantially identical white primary law of Texas,[6] and with the explicit statutory bar to their voting in the primary removed and because of a generally heightened political interest, Negroes in increasing

---

[3] La. Const. 1898, Art. 197, § 5.  See generally Eaton, The Suffrage Clause in the New Constitution of Louisiana, 13 Harv. L. Rev. 279.

[4] The Louisiana Constitution of 1868 for the first time permitted Negroes to vote.  La. Const. 1868, Art. 98.

[5] La. Const. 1921, Art. VIII, §§ 1 (c), 1 (d).

[6] *Smith* v. *Allwright,* 321 U. S. 649.

numbers began to register in Louisiana. The white primary system had been so effective in barring Negroes from voting that the "interpretation test" as a disfranchising device had been ignored over the years. Many registrars continued to ignore it after 1944, and in the next dozen years the proportion of registered voters who were Negroes rose from two-tenths of one percent to approximately 15% by March 1956. This fact, coupled with this Court's 1954 invalidation of laws requiring school segregation,[7] prompted the State to try new devices to keep the white citizens in control. The Louisiana Legislature created a committee which became known as the "Segregation Committee" to seek means of accomplishing this goal. The chairman of this committee also helped to organize a semiprivate group called the Association of Citizens Councils, which thereafter acted in close cooperation with the legislative committee to preserve white supremacy. The legislative committee and the Citizens Councils set up programs, which parish voting registrars were required to attend, to instruct the registrars on how to promote white political control. The committee and the Citizens Councils also began a wholesale challenging of Negro names already on the voting rolls, with the result that thousands of Negroes, but virtually no whites, were purged from the rolls of voters. Beginning in the middle 1950's registrars of at least 21 parishes began to apply the interpretation test. In 1960 the State Constitution was amended to require every applicant thereafter to "be able to understand" as well as "give a reasonable interpretation" of any section of the State or Federal Constitution "when read to him by the registrar."[8] The State Board

---

[7] *Brown* v. *Board of Education,* 347 U. S. 483.

[8] La. Acts 1960, No. 613, amending La. Const. Art. VIII, § 1 (d), previously implemented in La. Rev. Stat. § 18:36. Under the 1921 constitution the requirement that an applicant be able "to understand" a section "read to him by the registrar" applied only to illiterates. La. Const. 1921, Art. VIII, § 1 (d); compare *id.,* § 1 (c).

of Registration in cooperation with the Segregation Committee issued orders that all parish registrars must strictly comply with the new provisions.

The interpretation test, the court found, vested in the voting registrars a virtually uncontrolled discretion as to who should vote and who should not. Under the State's statutes and constitutional provisions the registrars, without any objective standard to guide them, determine the manner in which the interpretation test is to be given, whether it is to be oral or written, the length and complexity of the sections of the State or Federal Constitution to be understood and interpreted, and what interpretation is to be considered correct. There was ample evidence to support the District Court's finding that registrars in the 21 parishes where the test was found to have been used had exercised their broad powers to deprive otherwise qualified Negro citizens of their right to vote; and that the existence of the test as a hurdle to voter qualification has in itself deterred and will continue to deter Negroes from attempting to register in Louisiana.

Because of the virtually unlimited discretion vested by the Louisiana laws in the registrars of voters, and because in the 21 parishes where the interpretation test was applied that discretion had been exercised to keep Negroes from voting because of their race, the District Court held the interpretation test invalid on its face and as applied, as a violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and of 42 U. S. C. § 1971 (a).[9] The District Court enjoined future use of the test in the State, and with respect to the 21 parishes where the invalid interpretation test was found to have

---

[9] "Although the vote-abridging purpose and effect of the [interpretation] test render it *per se* invalid under the Fifteenth Amendment, it is also *per se* invalid under the Fourteenth Amendment. The vices cannot be cured by an injunction enjoining its unfair application." 225 F. Supp., at 391–392.

been applied, the District Court also enjoined use of a newly enacted "citizenship" test, which did not repeal the interpretation test and the validity of which was not challenged in this suit, unless a reregistration of all voters in those parishes is ordered, so that there would be no voters in those parishes who had not passed the same test.

## I.

We have held this day in *United States* v. *Mississippi, ante,* p. 128, that the Attorney General has power to bring suit against a State and its officials to protect the voting rights of Negroes guaranteed by 42 U. S. C. § 1971 (a) and the Fourteenth and Fifteenth Amendments.[10] There can be no doubt from the evidence in this case that the District Court was amply justified in finding that Louisiana's interpretation test, as written and as applied, was part of a successful plan to deprive Louisiana Negroes of their right to vote. This device for accomplishing unconstitutional discrimination has been little if any less successful than was the "grandfather clause" invalidated by this Court's decision in *Guinn* v. *United States, supra,* 50

---

[10] It is argued that the members of the State Board of Registration were not properly made defendants because they were "mere conduits," without authority to enforce state registration requirements. The Board has the power and duty to supervise administration of the interpretation test and prescribe rules and regulations for the registrars to follow in applying it. La. Rev. Stat. § 18:191A; La. Const. Art. VIII, § 18. The Board also is by statute directed to fashion and administer the new "citizenship" test. La. Rev. Stat. § 18:191A; La. Const. Art. VIII, § 18. And the Board has power to remove any registrar from office "at will." La. Const. Art. VIII, § 18. In these circumstances the Board members were properly made defendants. Compare *United States* v. *Mississippi, ante,* at 141–142.

There is also no merit in the argument that the registrars, who were not defendants in this suit, were indispensable parties. The registrars have no personal interest in the outcome of this case and are bound to follow the directions of the State Board of Registration.

years ago, which when that clause was adopted in 1898 had seemed to the leaders of Louisiana a much preferable way of assuring white political supremacy. The Governor of Louisiana stated in 1898 that he believed that the "grandfather clause" solved the problem of keeping Negroes from voting "in a much more upright and manly fashion" [11] than the method adopted previously by the States of Mississippi and South Carolina, which left the qualification of applicants to vote "largely to the arbitrary discretion of the officers administering the law." [12] A delegate to the 1898 Louisiana Constitutional Convention also criticized an interpretation test because the "arbitrary power, lodged with the registration officer, practically places his decision beyond the pale of judicial review; and he can enfranchise or disfranchise voters at his own sweet will and pleasure without let or hindrance." [13]

But Louisianans of a later generation did place just such arbitrary power in the hands of election officers who have used it with phenomenal success to keep Negroes from voting in the State. The State admits that the statutes and provisions of the state constitution establishing the interpretation test "vest discretion in the registrars of voters to determine the qualifications of applicants for registration" while imposing "no definite and objective standards upon registrars of voters for the administration of the interpretation test." And the District Court found that "Louisiana . . . provides no effective method whereby arbitrary and capricious action by registrars of voters may be prevented or redressed." [14] The applicant facing a

---

[11] Louisiana Senate Journal, 1898, p. 33.

[12] *Ibid.*

[13] Kernan, The Constitutional Convention of 1898 and its Work, Proceedings of the Louisiana Bar Association for 1898–1899, pp. 59–60.

[14] 225 F. Supp., at 384.

registrar in Louisiana thus has been compelled to leave his voting fate to that official's uncontrolled power to determine whether the applicant's understanding of the Federal or State Constitution is satisfactory. As the evidence showed, colored people, even some with the most advanced education and scholarship, were declared by voting registrars with less education to have an unsatisfactory understanding of the Constitution of Louisiana or of the United States. This is not a test but a trap, sufficient to stop even the most brilliant man on his way to the voting booth. The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar. Many of our cases have pointed out the invalidity of laws so completely devoid of standards and restraints. See, *e. g., United States* v. *L. Cohen Grocery Co.*, 255 U. S. 81. Squarely in point is *Schnell* v. *Davis,* 336 U. S. 933, affirming 81 F. Supp. 872 (D. C. S. D. Ala.), in which we affirmed a district court judgment striking down as a violation of the Fourteenth and Fifteenth Amendments an Alabama constitutional provision restricting the right to vote in that State to persons who could "understand and explain any article of the Constitution of the United States" to the satisfaction of voting registrars. We likewise affirm here the District Court's holding that the provisions of the Louisiana Constitution and statutes which require voters to satisfy registrars of their ability to "understand and give a reasonable interpretation of any section" of the Federal or Louisiana Constitution violate the Constitution. And we agree with the District Court that it specifically conflicts with the prohibitions against discrimination in voting because of race found both in the Fifteenth Amendment and 42 U. S. C. § 1971 (a) to subject citizens to such an arbitrary power as Louisiana has given its registrars under these laws.

## II.

This leaves for consideration the District Court's decree. We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. Little if any objection is raised to the propriety of the injunction against further use of the interpretation test as it stood at the time this action was begun, and without further discussion we affirm that part of the decree.

Appellants' chief argument against the decree concerns the effect which should be given the new voter-qualification test adopted by the Board of Registration in August 1962, pursuant to statute [15] and subsequent constitutional amendment [16] after this suit had been filed. The new test, says the State, is a uniform, objective, standardized "citizenship" test administered to all prospective voters alike. Under it, according to the State, an applicant is "required to indiscriminately draw one of ten cards. Each card has six multiple choice questions, four of which the applicant must answer correctly." Confining itself to the allegations of the complaint, the District Court did not pass upon the validity of the new test, but did take it into consideration in formulating the decree.[17] The court found that past discrimination against Negro

---

[15] La. Acts 1962, No. 62, amending La. Rev. Stat. 18:191A.

[16] La. Acts 1962, No. 539, amending La. Const. Art. VIII, § 18.

[17] Like the District Court, we express no opinion as to the constitutionality of the new "citizenship" test. Any question as to that point is specifically reserved. That test was never challenged in the complaint or any other pleading. The District Court said "we repeat that this decision does not touch upon the constitutionality of the citizenship test as a state qualification for voting." 225 F. Supp., at 397. The Solicitor General did not challenge the validity of the new test in this Court either in briefs or in oral argument, but instead

applicants in the 21 parishes where the interpretation test had been applied had greatly reduced the proportion of potential Negro voters who were registered as compared with the proportion of whites. Most if not all of those white voters had been permitted to register on far less rigorous terms than colored applicants whose applications were rejected. Since the new "citizenship" test does not provide for a reregistration of voters already accepted by the registrars, it would affect only applicants not already registered, and would not disturb the eligibility of the white voters who had been allowed to register while discriminatory practices kept Negroes from doing so. In these 21 parishes, while the registration of white persons was increasing, the number of Negroes registered decreased from 25,361 to 10,351. Under these circumstances we think that the court was quite right to decree that, as to persons who met age and residence requirements during the years in which the interpretation test was used, use of the new "citizenship" test should be postponed in those 21 parishes where registrars used the old interpretation test until those parishes have ordered a complete reregistration of voters, so that the new test will apply alike to all or to none. Cf. *United States* v. *Duke,* 332 F. 2d 759, 769–770 (C. A. 5th Cir.).

It also was certainly an appropriate exercise of the District Court's discretion to order reports to be made every month concerning the registration of voters in these 21

---

recognized specifically that that issue was not before us in this case. And at oral argument in this Court the attorney for the United States stated that the Government has pending in a lower court a new suit challenging registration procedures in Louisiana "under the new regime," *i. e.,* employed subsequent to the invalidation of the interpretation test in this case. The new "citizenship" test, he said, "is simply not an issue in this proceeding and was not invalidated in the lower court and we are not here challenging it."

parishes, in order that the court might be informed as to whether the old discriminatory practices really had been abandoned in good faith. The need to eradicate past evil effects and to prevent the continuation or repetition in the future of the discriminatory practices shown to be so deeply engrained in the laws, policies, and traditions of the State of Louisiana, completely justified the District Court in entering the decree it did and in retaining jurisdiction of the entire case to hear any evidence of discrimination in other parishes and to enter such orders as justice from time to time might require.

*Affirmed.*

MR. JUSTICE HARLAN considers that the constitutional conclusions reached in this opinion can properly be based only on the provisions of the Fifteenth Amendment. In all other respects, he fully subscribes to this opinion.