**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 169, an unincorporated association, et al., Defendants-Appellees.**

No. 71–1389.

United States Court of Appeals, Seventh Circuit.

Jan. 4, 1972.

Rehearing Denied Feb. 8, 1972.

---

**212**

Henry A. Schwarz, U.S. Atty., David L. Norman, Acting Asst. Atty. Gen., Civil Rights Division, David L. Rose, Chief, Employment Section, U. S. Department of Justice, Andrew J. Ruzicho, Department of Justice, St. Louis, Mo., Gerald F. George, Atty., Department of Justice, Washington, D. C., for appellant.

Bernard M. Mamet, Chicago, Ill., Gary M. Baxter, Chicago, Ill., on the brief, for defendants-appellees.

Before FAIRCHILD and SPRECHER, Circuit Judges, and CAMPBELL, Senior District Judge.*

SPRECHER, Circuit Judge.

The principal question raised by this appeal is whether a construction union may be engaged in a pattern or practice of resistance to the full enjoyment of the employment rights guaranteed by Title VII of the Civil Rights Act of 1964, because it refuses to cooperate with a plan—intended to implement those rights—to which it is not a party.

This action was brought by the Attorney General, who sought relief for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and for interference with the implementation of Presidential Executive Order No. 11246 and Section 22(a) of the Federal Aid Highway Act of 1968, 23 U.S.C. § 140, which require equal employment opportunities by contractors and subcontractors on federal and federally assisted construction projects.

In July 1968, the United States Department of Transportation ordered all federal funds for highway construction in Madison and St. Clair Counties withheld from the State of Illinois for an indefinite period because of high costs and lack of equal employment opportunities.

Six principal crafts perform approximately 95 percent of the work on highway construction—teamsters, laborers, carpenters, cement finishers or masons, ironworkers and operating engineers.

After the freeze of federal highway funds in the two counties, representatives of the six craft organizations, of the contractors and subcontractors and of the black community met with federal and state officials. Their meetings resulted in the promulgation on June 3, 1970 by the governor of Illinois of "An Agreement to Facilitate Equal Employment Opportunity in State Highway Construction in Madison and St. Clair Counties" (Ogilvie Plan).

The Ogilvie Plan was signed and executed by the Southern Illinois Builders Association, an Illinois not-for-profit corporation whose members are contractors engaged in the building and construction industry in southern Illinois, and by the Metro-East Labor Council, Inc., an organization of representatives of the black community in Madison · and St. Clair Counties whose purpose is the furtherance of equal employment opportunities in the construction industry.

The two teamsters locals affected signed an "Addendum" to the plan and

* Senior Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

agreed to its implementation. The laborers have acquiesced in its implementation. After the filing of suits similar to this one by the United States, the cement finishers, ironworkers and operating engineers, through their respective unions, entered into consent decrees and agreed to cooperate with the plan.

After the promulgation of the Ogilvie Plan, federally assisted highway construction resumed in the two-county area.

A few days after the promulgation of the plan, the business agent for one of the Carpenters Union locals wrote ". . . [W]e will co-operate with all concerned and work religiously with the addendum to the contract. . . ." Since the program was initiated, however, the carpenters have repeatedly, frankly and openly admitted their opposition to the program.[1]

The action was filed on November 25, 1970 against two Carpenters Union locals (169 and 480), their business agents (Rainbolt and McGuire) and the Tri-Counties Illinois Carpenters District Council of the United Brotherhood of Carpenters and Joiners of America (Tri-Counties Council). It alleged violation of Title VII of the Civil Rights Act of 1964[2] and interference by the defendants with the implementation of Executive Order 11246[3] and Section 22(a) of the Federal Aid Highway Act of 1968.[4]

1. The defendants in their brief in this court have stated (page 12, footnote 10): "The Civil Rights Division introduced a series of witnesses to prove that the Defendants were opposed to and would not cooperate with the Ogilvie Plan and that they refused a request to 'refer' Ogilvie Plan trainees to the Hall Construction job. . . . Actually, such testimony was unnecessary because the Carpenters, in their Answer, openly admitted their opposition to the Ogilvie Plan, pointing out their objections thereto and stating, *inter alia*, that the instant lawsuit was merely a device to have them *accept the Ogilvie Plan to which the Car-penters were not signatories*. . . . Rainbolt, in his deposition, . . . testified that not only did his organization and members oppose the Ogilvie Plan, but, additionally, the Plan was op-*posed by the Tri-Counties District Coun-cil of Carpenters and the Illinois State Council of Carpenters*. Rainbolt repeated such statements in his testimony in open court . . . as did Richard Meile for the District Council . . . and James McGuire for Local 480. . . . Similarly, employees of Hall, who quit his employment, expressed their opposition to the Ogilvie Plan. . . ."

2. Section 707 of the act provides in part (42 U.S.C. § 2000e–6):
"(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint . . . requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described."

3. Under Executive Order 11246 (42 U.S.C. § 2000e, p. 610),
"The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, . . . recruitment . . . and selection for training, including apprenticeship."

4. Section 22(a) of the Act provides in part (23 U.S.C. § 140):
"In approving programs for projects on any of the Federal-aid systems, the Secretary shall, where he considers it necessary to assure equal employment opportunity, require certification by any State desiring to avail itself of the benefits of this chapter that there are in existence and available on a regional, statewide, or local basis, apprenticeship, skill improvement or other upgrading programs, registered with the Department of Labor or the appropriate State agency, if any, which provide equal opportunity for training and employment without regard to race, color, creed or national origin."

The carpenters as a group did not question the legality of the Ogilvie Plan [5] but "adamantly resisted the attempted imposition of the plan upon it because of its belief that it would ruin the status of the craft and destroy the apprenticeship program and seriously undermine the collective bargaining agreement."

## I

As in most cases involving Title VII of the Civil Rights Act of 1964, this case begins with statistical evidence or demography. Racial statistics not only serve to trigger enforcement,[6] but "[o]n the basis that a showing of an absence or a small black union membership in a demographic area containing a substantial number of black workers raises an inference that the racial imbalance is the result of discrimination, the burden of going forward and the burden of persuasion is shifted to the accused, for such a showing is enough to establish a *prima facie* case." United States v. Ironworkers Local 86, 443 F.2d 544, 551 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

Locals 169 and 480 are unincorporated associations of men in the carpenters' trade in the East St. Louis area. Their principal offices are located in St. Clair County, Illinois; East St. Louis is the principal metropolitan area in St. Clair County.

The district court complained of the incompleteness of the racial statistics furnished; but the statistics are readily available and show the following black population: [7]

| | East St. Louis | St. Clair County |
|---|---|---|
| 1940 | 22.2% | 12.9% |
| 1950 | 33.5% | 16.8% |
| 1960 | 44.6% | 18.3% |
| 1970 | 69.2% | 22.4% |

Both Locals 169 and 480 have reputations in the black community as white locals. Prior to 1948, there were no black members of Local 169. The evidence showed and the district court found that Local 169 has approximately 440 active members and 110 retired members. Of these 550 members, 39 or about 7 percent are black and were admitted in the following years:

| | | | |
|---|---|---|---|
| 1948—2 | | 1965—2 | |
| 1950—2 | | 1966—7 | |
| 1953—1 | | 1967—1 | |
| 1955—1 | | 1968—4 | |
| 1960—4 | | 1969—6 | |
| 1964—1 | | 1970—8 | |

Ten of the 39 were transfers from other carpenter unions.

Local 480 has 367 members, one of whom is black.

The black members of Local 169 worked an average of 1300 hours during the year August 1, 1969 to July 31, 1970, in contrast to the 1524 average hours worked by white members. The white members worked 17.2 percent more hours on the average than the black members.

There was other, non-statistical evidence of discrimination.

---

5. The plan was held to be in accord with the Civil Rights Act of 1964 and not violative of the Fifth or Fourteenth Amendments in Southern Illinois Builders Association v. Ogilvie, 327 F.Supp. 1154 (S.D.Ill.1971), pending on appeal in this court as No. 71–1771.

6. Fiss, "A Theory of Fair Employment Laws," 38 U. of Chi.L.Rev. 235, 268–81 (1971). The classic statement has been that "statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

7. These statistics are from the United States Bureau of Census Reports, of which a court may take judicial notice. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 n. 4 (8th Cir. 1970). Moreover, the testimony adduced regarding population for 1960 and estimated for 1970 was substantially comparable to the exact census figures.

The district court, finding some evidence of nepotism, said, "[I]t may well be that it does exist in the carpenter trade as it does in other areas and specifically the professions." The Fifth Circuit observed in Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047, 1054 (5th Cir. 1969):

"While the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-Americans any real opportunity for membership." [8]

Although Locals 169 and 480 did not under their collective bargaining agreement operate exclusive hiring halls or exclusive referral systems, they did refer persons out for carpentry work through hiring halls. The district court found:

"The evidence established that the procedure in the hiring hall was for the business agent to call out, among other things, the type of job available, the number of carpenters needed on the particular job, and that those carpenters desiring to take the offered employment 'jumped up' and whoever was the first to 'jump up,' as they put it, was given priority on the job. Both blacks and whites testified that this procedure was followed in the union hall hiring practice and each testified that it did not result in discrimination against blacks; that the blacks had an equal opportunity with the whites;

that if blacks 'jumped up' first, they would be awarded the job on equal basis with the whites."

Such a system of referral is wholly subjective and inherently non-reviewable; nevertheless, it must be viewed in light of the facts that white members worked 17 percent more hours on the average than black members and that the Union official who determined who "jumped up" first told a contractor seeking a black carpenter on at least one occasion, "I have 125 white men sitting here who have been paying dues in this union for years and I cannot send out the black ones before hiring them."

The Union also controlled hiring by issuing or refusing to issue "permits" to nonmembers who had obtained carpentry jobs. Many contractors would not let a man work if he had failed to obtain a permit from the Union. There was considerable evidence that the Union's policy in issuing permits discriminated against black persons.

The district court concluded that the small number of black members in the Carpenters Union "might readily be attributed to a lack of diligent efforts on the part of the blacks to effectively pursue their attempts to become union members." [9] He found that the nepotism was "not racially oriented" and that, in regard to the hiring halls, "[t]here was not one scintilla of evidence presented to show that this particular procedure resulted in any racial discrimination."

8. Judge Kiley made a similar observation in United States v. Iron Workers, Local 1, 438 F.2d 679, 683 (7th Cir. 1971). Sons of some of Local 169's early black transfer members were admitted in later years, which shows, as the district court found, that "the nepotism is not racially oriented." However, when the union opens its door to a token number of blacks, nepotism applied evenly tends to solidify the minuscule percentage of blacks.

9. Walter Simms, a black carpenter with seven years' experience, tried unsuccessfully three times to get a work permit from Local 169. Oscar Dean, a black

carpenter since 1923 and a member of several locals throughout the country of the United Brotherhood of Carpenters and Joiners of America since 1946, tried to transfer to Local 169 in 1959 and again in 1969 and he went to the union hall 20 to 30 times in 1970 looking for work. Leonard Whiteside, a black carpenter, made two unsuccessful attempts to join Local 169. Lonzo Hibbler, a black carpenter, tried once. Ralph Foster, a black carpenter, tried twice. Edward Slack, a black contractor, tried to get 50 to 60 blacks, at least 15 of whom were qualified carpenter journeymen, into Local 169 prior to 1969 without success.

These conclusions cannot follow from the undisputed evidence in this record in view of the Supreme Court's language in Griggs v. Duke Power Co., 401 U.S. 424, 430, 431, 432, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971):

> "Under the [Civil Rights] Act [of 1964], practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices. . . .
>
> "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. . . .
>
> ". . . Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." (Emphasis in original.)

■ Courts have the power and the duty not only to prevent future discrimination and to terminate present discriminatory practices, but also to eliminate the vestiges of past discrimination. Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); United States v. Ironworkers Local 86, 443 F.2d 544, 553 (9th Cir.), cert. denied, 40 U.S.L.W. 3263 (1971); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 427 (8th Cir. 1970); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123, 131 (8th Cir. 1969); Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047, 1052–53 (5th Cir. 1969).

## II

■ The Ogilvie Plan provided a program for the recruitment, placement and training of minority group members in the highway construction industry. Minority group members who had worked as journeymen "under permit" for at least one year were to be considered as qualified journeymen by the contractors, who were to make every effort to employ them. Minority applicants who believed that their previous experience qualified them as journeymen were to be considered by a craft selection subcommittee of a six-member Equal Opportunity Administrative Committee, consisting of two members representing the contractors, two representing the black community and two representing the governor. If the craft selection subcommittee determined that the minority applicant's experience qualified him as a journeyman, he was to be so considered for employment by the contractors.

Those minority applicants who did not qualify as journeymen were eligible for a one-week orientation course in highway construction work, followed by a training program in one of the six trades. In the case of carpenter trainees, the training program was to consist of 480 hours of instruction during a 12-week period in the highway construction off-season. After successful completion of the training course and testing, the trainees who were deemed qualified by the committee were to be given immediate journeyman status. Those who passed the training course and tests but were not deemed equivalent in skill for journeyman status were to be hired by the contractors as trainees for up to 200 days of on-the-job training at wages of from 60 to 90 percent of the journeyman's rate for the carpenter craft.

On November 13, 1970, the first 15 black trainees graduated from the Ogilvie Plan's 12-week training course in carpentry and were ready and willing to be referred to contractors and to receive their on-the-job training. H. H. Hall Construction Company (H. H. Hall), a member of the Southern Illinois Builders Association (SIBA), because of its contractual obligations with the State of Illinois and the federal government, requested a trainee from Local 169 on November 16. The business agent told Hall that the Union would not honor its request and would not cooperate with the Ogilvie Plan. In addition, the Union assessed a fine of $200 against the Local 169 member who trained the Ogilvie Plan trainees.

On November 17, the Metro-East Labor Council, Inc. referred seven trainees

to the union hall and requested that the Union issue them permits. None of the trainees was issued a permit. H. H. Hall again called the Union on November 17 and requested the Union to refer either Earl Johnson or Julius Neither, both black trainees. The Union refused to honor this request.

In refusing to do so, the business agent of Local 169 referred several times in the telephone conversation to the Ogilvie Plan in terms laden with racial overtones.

H. H. Hall then exercised its prerogative under the collective bargaining agreement [10] and hired Julius Neither directly on November 18.

All the carpenters except the two stewards [11] promptly walked off the job. Thereafter, the two stewards refused to assist or give any training or instructions to any black Ogilvie Plan trainee, although they do assist and instruct other persons who are performing carpenter work. In addition, on the following day after a Union steward talked to them, two white carpenters walked off the H. H. Hall yard job, located approximately four miles from the job site where the trainee was working.

None of the carpenters who "walked off" returned to work for H. H. Hall, although the company made repeated requests to them and to the Union for them to return to work.

One carpenter who indicated that he was willing to work for H. H. Hall during the strike was afraid that taking the job would require him to "sacrifice my card," that is, lose his Union membership. The Union failed to refer any carpenters to H. H. Hall, although it had a number of men out of work. One carpenter who sought work from the Union was told that there was no work, although H. H. Hall had renewed its request for car-

penters the afternoon prior to and earlier the same morning of the carpenter's inquiry. Four of the carpenters who walked off the Hall job site were referred to other jobs immediately thereafter, although the Union had many other men out of work.

The H. H. Hall work stoppage forced it to lay off other personnel as well, thereby making that contractor and other members of the SIBA reluctant to implement the Ogilvie Plan by hiring black trainees. At the time of the trial, there was apprehension that the two-county freeze of federal highway funds to the State of Illinois would be resumed as a result of the obstructionist techniques of the defendants.

The district court found that "none of the defendants is a signatory to the Ogilvie Plan" and that "[f]ailure to cooperate with the Ogilvie Plan or failure to follow the Ogilvie Plan, or failure to work with trainees of the Ogilvie Plan, standing alone and in and of itself, is not sufficient to establish a cause of action under this complaint."

The error made by the district court is that failure to follow the Ogilvie Plan is upon this record clearly not "standing alone and in and of itself." The record begins with the historical exclusion of blacks, reinforced by nepotism and hiring hall "jump-up" referrals. The record continues through the militant opposition not only to the Ogilvie Plan itself but also to the equal employment opportunities which the plan was striving to achieve.

The Federal Aid Highway Act of 1968 requires the State of Illinois to adopt the Ogilvie Plan or one substantially like it with apprenticeship, skill improvement or other upgrading programs; Executive Order 11246 requires contractors to take affirmative action in regard to

---

10. "Responsibility for Hiring. The EMPLOYER shall have the sole and exclusive responsibility for hiring and may hire from any source it desires without paying heed to membership in the UNION or referral or clearance therefrom."

11. The Union admitted that the only reason the stewards were left on the job was that the contract contained a no-strike clause; leaving the stewards on the job allegedly gave the Union some basis for arguing that the walk-off was not a strike.

equal opportunity employment, upgrading, recruitment and selection for training, including apprenticeship; and Title VII of the Civil Rights Act of 1964 provides (42 U.S.C. § 2000e–2(c)):

"It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

It is also an unlawful employment practice for any labor organization (42 U.S.C. § 2000e–2(d)) "to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

In this case, the state attempted to perform its duties under the statute, the contractors tried to fulfill their responsibilities under the executive order, and five of the six crafts affected strove to achieve some of the goals fixed by the Civil Rights Act of 1964. The defendants believed that they could single-handedly and actively undermine the joint efforts of the federal and state governments, the black community, the contrac-tors and the other labor organizations by not becoming a signatory to the plan.

In view of the record in this case, it is wholly immaterial whether the defendants were signatories or not. Congress did not intend that the Civil Rights Act be applicable to and enforceable against only those persons who contractually agree to be bound to a plan of implementation. Moreover, the failure of the defendants to agree to the Ogilvie Plan obviously did not entitle them to interfere with the contractual rights of those who did so agree. The defendants have interfered with the contract between the SIBA and Metro-East Labor Council, Inc., and they have particularly interfered with and sought to procure its breach by H. H. Hall Construction Company. Prosser, Law of Torts 950–995 (3rd ed. 1964).

The record contains undisputed facts which amply support the charge in the complaint of "interference with the implementation of Presidential Executive Order 11246 and Section 22(a) of the Federal Aid Highway Act of 1968."

The district court was clearly in error in finding for the defendants and against the United States. It clearly erred in finding, "If there was discrimination with regard to the Ogilvie Plan, the evidence showed that it was based on union versus non-union, but definitely not on race." Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

III

The defendants rely, in their effort to support the district court's judgment, not only upon their failure to sign the Ogilvie Plan but also (1) upon the fact that under their collective bargaining agreement the Carpenters Union does not operate exclusive hiring halls and (2) upon the establishment by the Carpenters Union of its own apprenticeship system. The evidence in the record relating to these facts tends to support the conclusion that the defendants were and are "engaged in a pattern or practice of re-

sistance to the full enjoyment of the rights secured" by Title VII of the Civil Rights Act of 1964, rather than the contrary.

Although the collective bargaining agreement between the SIBA members and the Carpenters Union does provide that the employer "may hire from any source it desires without paying heed to membership in the union or referral or clearance therefrom," the futility of an employer's attempting to hire outside the Union hiring halls is completely documented by the H. H. Hall episode.

The executive director of the SIBA testified that the vast majority of contractors call the union hall for referral; that the contractors rarely hire men off the street; and that if they do "it normally leads to a reluctance on the part of the union people to work with the men hired off the street," particularly if a nonmember is taken on.

The defendants argue that in the "only six cases in which decisions have been written in completed cases dealing with 'pattern or practice' suits *brought against construction unions* under the Civil Rights Act of 1964 . . . there was an exclusive hiring hall. . . ." [12]

In all six cases, the courts found that the particular construction unions involved pursued a pattern or practice of resistance to full employment of blacks in violation of Title VII. We find no such distinction in the hiring practices in those cases as contrasted with the practices in this case sufficient for us to reach a different result. Where, as here, the union members refuse to work with nonmembers who are working without union approval, the union in fact exerts effective control over employment in the trade by controlling membership and issuance of permits, notwithstanding contractual provisions purportedly permitting employment without regard for union membership or approval.

The principal justification advanced by the defendants for their opposition to the Ogilvie Plan was that it works at cross-purposes to, and would destroy, their four-year apprenticeship program and the standards of their trade.[13]

Apprenticeship programs in the construction trades have not produced many minority union members,[14] and the record in this case does not furnish any justification whatsoever for the interference by the defendants with the Ogilvie Plan.

The collective bargaining agreement dated August 1, 1969, between the SIBA members and Tri-Counties Council (governing Locals 169 and 480) provided for an apprenticeship program under a Joint Apprenticeship Committee (JAC). Qualifications for selection include (1) completion of an application with references, (2) a complete physical examina-

12. Dobbins v. Electrical Workers, Local 212, 292 F.Supp. 413 (S.D.Ohio 1968); United States v. Plumbers Local 73, 314 F.Supp. 160 (S.D.Ind.1969); Local 53, Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th Cir. 1969); United States v. Electrical Workers, Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

13. A similar argument was made that the so-called Philadelphia Plan interfered with the construction unions' practice of referring men from the hiring halls on the basis of seniority and that few minor-

ity tradesmen have high seniority. The argument was rejected and the plan approved in Contractors Ass'n. v. Secretary of Labor, 442 F.2d 159, 172 (3rd Cir.), cert. denied, 40 U.S.L.W. 3165 (1971).

14. Strauss & Ingerman, "Public Policy and Discrimination in Apprentices," 16 Hast. L.J. 285, 301–06 (1965); Kovarsky, "Apprentice Training Programs and Racial Discrimination," 50 Iowa L.Rev. 755 (1965); Boyce, "Racial Discrimination and the National Labor Relations Act," 65 NW.U.L.Rev. 232, 242–45 (1970); Comment, "The Philadelphia Plan vs. The Chicago Plan: Alternative Approaches For Integrating the Construction Industry," 65 NW.U.L.Rev. 642 (1970); Marshall & Briggs, The Negro and Apprenticeship (1967).

tion, (3) completion of four years of high school or the equivalent, (4) passing of a written aptitude test, and (5) evaluation during oral interviews.

If all these barriers are successfully hurdled, the applicant goes on a waiting list. After the waiting period, if an applicant begins the apprenticeship program, he must attend school two nights a week or 144 hours a year for four years.

At the time of trial, the JAC of the Tri-Counties Council (including Locals 169 and 480) had 119 apprentices, of whom five were black. No black apprentice had ever graduated from the program.

Local 480 had 22 apprentices, none of whom was black. Local 169 had 14 apprentices, five of whom were black and one of whom was a Spanish-American.

William Dandridge, a black applicant for apprenticeship with some six or seven years of carpentry experience, scored highest of 41 applicants on the apprentice waiting list. From April to December 1970, he tried without success to obtain work through Local 169. No apprentices were sent out by 169 during that period. After the complaint was filed in this case, he obtained work through Local 480 at the low beginning-apprentice rate. His four years of schooling had not yet begun.

The treatment accorded Dandridge, who had some prior carpentry experience, had been graduated from high school, had been honorably discharged from military service and scored higher than 40 other applicants in the apprenticeship tests, may be compared with the experience of some of the white members of Local 169. Kenneth Shelby had an eighth-grade education and became a journeyman member at the age of 17, whereupon he was paid the full journeyman's rate. His father and uncle were members of Local 169. He was not required to serve any apprenticeship. Donald Sanftleben became a full journeyman member of Local 169 at the age of 18 without any apprenticeship. His father and uncle were members of the Union. Salvador Spicuzza became a full journeyman carpenter in 1970 without any apprenticeship and with only two years' prior experience.

From 1960 through 1970, Locals 169 and 480 initiated a total of 62 members who had no apprenticeship training and less than four years' prior experience. Three of these 62 were black members.

█ It is obvious and uncontradicted on the record that the JAC apprenticeship program does not serve the same function as the Ogilvie Plan was intended to perform. Its existence does not justify the defendants in obstructing the operation of the plan. No member of a minority race has ever become a journeyman member of Locals 169 or 480 through their apprenticeship program.

Defendants made the argument that the question was not white versus black, but was "which blacks." The record shows that the Union was instead trying to control "how many blacks." This it cannot do under the 1964 Civil Rights Act.

IV

The district court should fashion appropriate affirmative relief, beginning with a permanent injunction prohibiting discriminatory practices in general terms and specifically prohibiting interference with the rights of black persons to work in the carpentry trade. It should retain jurisdiction, possibly with provisions for intermediate reporting by the defendants. See, for example, the order entered in United States v. Plumbers Local 73, 314 F.Supp. 160, 164–67 (S.D. Ind.1969).

The decree should enjoin the defendants and their members from engaging in or encouraging strikes, work stoppages or other interferences with implementation of the Ogilvie Plan or any other plan or training program having the purpose of correcting the effects of racial discrimination in the carpentry trade. The decree should direct the defendants to issue permits to black per-

sons trained pursuant to the Ogilvie Plan and to all other black carpenters hired by employers in the same manner as they issue permits to white persons.

The district court should consider, in view of any further evidence he may wish to hear, the requirement of improvements in the hiring hall referral system, possibly on a first-in, first-out basis as ordered in United States v. Plumbers Local 73, *supra* at 165–66.

The judgment of the district court is vacated; this case is reversed and remanded for further proceedings consistent with this opinion.