James E. BROWN, Plaintiff,

v.

John O. MARSH, Secretary of The Army, Defendant.

Civ. No. 80–1169 (CRR).

United States District Court, District of Columbia.

May 11, 1989.

See also 707 F.Supp. 21.

Joseph M. Sellers, Washington Lawyers' Committee for Civil Rights Under Law, John R. Erickson, Reed Smith Shaw & McClay, Washington, D.C., for plaintiff.

William J. Dempster, Asst. U.S. Atty., with whom Jay Stephens, U.S. Atty., and John D. Bates, Asst. U.S. Atty., were on the briefs, for defendant.

CHARLES R. RICHEY, District Judge.

On May 12, 1988, the Court granted partial summary judgment in the plaintiff Brown's favor on the issue of liability in this Title VII action. The Court found that the defendant (the "Army") had failed to respond in a timely fashion to a proposed disposition of Brown's case prepared by the EEOC. The EEOC's proposed disposition included a finding that the Army had discriminated against Brown on the basis of his race, which is black. Accordingly, and in compliance with the terms of a Memorandum of Understanding that had been executed between the Army and the EEOC, the Court found that the Army's delinquent response effectively constituted an "adop-

tion" of the EEOC's finding of discrimination.

The Court's decision to enforce the EEOC's finding on the issue of liability, however, left unresolved the details of a rather large aspect of the case—the remedy to which Brown is entitled. The Court, trusting in the reasonableness of the plaintiff and the fairness of the Army, had hoped that the parties would be able to resolve the issue among themselves. The passage of time, however, coupled with the venting of much spleen, ultimately convinced the Court that its trust was misplaced. Accordingly, the Court directed the parties to submit detailed statements of the relief to which Brown may be entitled, and obtained the parties' permission to decide the issue on the basis of these submissions.[1] The Court has reviewed the parties' papers, and describes herein the relief which Brown shall obtain.[2]

## A. *Brown's Career Path*

 The Court's grant of partial summary judgment dealt with the Army's refusal to hire Brown to a GS–9 position in 1976. The Court's judgment adopted the EEOC's conclusion that, in failing to obtain the position, Brown was the object of race-based discrimination. The Court further adopted the EEOC's suggestion that Brown be promoted to a GS–9 position retroactive to August 21, 1975, and that he receive back pay, including all within-grade increases, pay adjustments, and any promotions that may have accrued by way of restructuring or reclassification of the job that Brown was denied.[3]

The language of the EEOC report, as tracked by this Court in its order of partial summary judgment, appears to limit Brown's retroactive relief to such improvements as may have occurred in the *particular* GS–9 position for which Brown applied. In other words, the language seems to suggest that Brown's relief should be structured solely according to the evolution of the *position* which Brown was improperly denied. The Army's arguments reflect this reading; the Army contends that Brown's retroactive relief should be calculated at a GS–9 level only.

Brown wants more. He bases his request for relief on the subsequent career path of the individual (Charles Sheuddig) actually chosen for the GS–9 position, although Brown asks the Court to ignore several career setbacks experienced by Sheuddig which, according to Brown, he would not have suffered. Brown's approach would mirror precisely Scheuddig's progress from 1975 to 1982, during which time Scheuddig moved from a GS–9 to a GM–13. From 1982 to the present, however, for various reasons which Brown suggests would not apply to him, Scheuddig

---

**1.** This somewhat abbreviated procedure, accepted by all parties, perhaps reflects a yearning by the participants' to see this litigation end sometime before the Millennium. As Judge Mikva noted in 1985, in reversing this Court's dismissal of Brown's complaint, "this dispute has gone on far too long and has burdened the time and resources of more different courts and judges than was reasonably necessary," and that "it is long past time for this matter to be resolved." *Brown v. Marsh,* 777 F.2d 8, 11 (D.C.Cir.1985). The Court fervently hopes that this will be the last chapter in this multi-volume treatise of intransigence, bullheadedness and irresponsible litigation tactics from both parties. Note, however, that the Court excepts plaintiff's current counsel from this latter reference.

**2.** This opinion addresses only the types of relief as to which there is a dispute. The parties have agreed to certain forms of relief, and the Order issued in connection with this Opinion will reflect those areas of agreement.

**3.** The pertinent portion of the Court's Order of May 12, 1988, reads as follows:

FURTHER ORDERED, that judgment shall be entered in favor of the plaintiff to the extent required by the Court's adoption of the EEOC decision in the Report of Supplemental Investigation, specifically

—judgment shall be entered in favor of the plaintiff on his claim of discrimination by reason of reprisal, and

—judgment shall be entered granting plaintiff a promotion to a GS–9 position similar to the position denied him, and such promotion shall be retroactive to August 21, 1975, and

—judgment shall be entered awarding plaintiff backpay, including all within-grade increases, pay adjustments and any promotions that may have accrued by way of restructuring or reclassification of that type of job.

moved between GM–13 and GS–12. Scheuddig is presently a GS–12. Brown asks the Court to ignore Scheuddig's instability from 1982 to the present, and to (1) compensate Brown as a GM–13 consistently during this period, and (2) install him in a position compensated at the GM–13 level.

After reviewing the evidence, the Court is convinced that compensation pursuant to Brown's "career path" theory is required to make him "whole." In *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Supreme Court articulated Title VII's remedial objective as being "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.* at 418, 95 S.Ct. at 2372. Accordingly, a district court which endeavors to fashion a remedy for discrimination cannot confine itself to narrow or technical measures which, while perhaps bearing a logical connection to the plaintiff's complaint, fail to reflect the whole of the plaintiff's injury. Rather, comprehensiveness, and a keen sensitivity to the equities of the case before it, must control the court's determination.

The record in this case suggests that Brown was an eminently competent employee, and perhaps an exceptional one.[4] His personnel reviews during the pertinent period consistently sing Brown's praises; his analytical and organizational skills are noted and extolled at every turn. Logic and the record thus compel the conclusion that Brown—absent the Army's discriminatory action and the career hurdles erected by the pendency of this litigation—would have progressed well beyond the GS–9 level. To restrict his remedy to GS–9, as the Army requests, would therefore be to engage in precisely the type of cramped remedial architecture that *Albemarle* and Title VII generally abhor. A remedial decree which considers career progress improperly denied is well within this Court's discretion under Title VII. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 399, 102 S.Ct. 1127, 1135–36, 71 L.Ed.2d 234 (1982); *Franks v. Bowman Transport. Co., Inc.*, 424 U.S. 747, 762, 96 S.Ct. 1251, 1263, 47 L.Ed.2d 444 (1976).

The obvious benchmark for evaluating Brown's thwarted progress is the career path of the man promoted in his stead—Charles Scheuddig. With this said, of course, the Court immediately concedes the analytical imprecision of such an approach. In the real world, even had Brown been awarded the GS–9 position by totally objective decisionmakers, it is conceivable that he could have been killed by a bus on his way to celebrate his new job. The point is simple: there is no way of assuring with certainty that, absent discrimination, Brown's career would have ascended in the same way as Scheuddig's. The use of Scheuddig's career as a proxy for Brown's should not be taken as a finding that Brown's employment history, as a factual matter, would have mirrored Scheuddig's. The Court merely adopts this methodology because the Army's alternative—compensation at a GS–9 level—seems clearly inequitable, and because there appears to be no more precise way of providing Brown full compensation.[5]

---

[4]. Notwithstanding this point, however, the Court eschews any suggestion that it condones the irresponsible manner in which Brown has employed the courts in his battle against discrimination. As the Court of Appeals for the Federal Circuit put it—five years ago—in addressing another component of Brown's litigational phalanx:

By using the approach of multiple claims and charges and citing almost every conceivable source of federal remedy under the statutes and the Constitution, appellant has succeeded in getting 17 decisions on his complaints, 12 of them now in published orders or opinions. His arguments have been flagrantly redundant if not frivolous, and they smack of harassment. He has required the attention of 16 federal judges on 30 occasions. Some judges have sat on more than one of his cases since part of his litigation technique has been piecemeal litigation. It is impossible to escape the conclusion that the judicial process has been badly abused by appellant Brown. *Brown v. United States*, 741 F.2d 1374, 1377 (Fed.Cir.1984). However, the fact that Brown may be an irresponsibly inveterate litigator does not diminish his entitlement to a remedy in this action.

[5]. To the extent the imprecision in the Court's methodology overcompensates Brown, the deterrence objectives of Title VII's remedy provision may excuse this result. *See Albemarle*, 422 U.S. at 417–18, 95 S.Ct. at 2371–72. *See also*

Using Scheuddig's career path as a guide, Brown is clearly entitled to the difference between what he earned and what Scheuddig earned during the period from August 21, 1975 (the date of the improper denial) and June 8, 1982.[6] The latter date, however, presents the first problem. On May 23, 1982, Scheuddig was appointed to a temporary position as a Housing Project Manager, which was compensated at a GM–13 level.[7] The position was set to be filled permanently on or about June 8, 1982. Scheuddig was entitled to apply for the permanent position, but, for reasons that are unclear, chose not to do so.[8] As a result, once a permanent employee was chosen, the Army downgraded Scheuddig to another GS–12 position. Brown, however, contends that he would have applied for and been chosen to fill the permanent position as Housing Project Manager, and that his remedial career path should depart from Scheuddig's in this respect.

On its face, Brown's claim seems to suffer from an excess of self-confidence. Yet, when the record is considered, Brown's claim becomes more reasonable; indeed, it becomes quite persuasive. The record proves nothing if not Brown's ambition. Brown consistently applied for advanced positions during the years in question; he was an aggressive employee whose immediate goal at all times seems to have been self-advancement. It would ignore Brown's nature, as revealed in the record, to conclude that he would not have applied for the permanent position as Housing Project Manager when it became available in June of 1982.

The record also indicates a likelihood that he would have been chosen for the permanent position. As noted above, Brown was a stellar employee. His performance evaluations are replete with glowing commendations. At least two of his supervisors, in materials prepared in connection with this litigation, have indicated that Brown would have been chosen for promotion to other (concededly less senior) positions had certain restrictions, related to this litigation, not been in place.[9] While the foregoing cannot establish Brown's entitlement to the permanent position with ontological certainty, they do prove to the Court's satisfaction that equity requires that Brown's "remedial bundle" include compensation reflecting a successful application for the permanent position.[10]

The next question is whether events which effected Scheuddig in 1986 and 1987 should be attributed to Brown. In 1984, Scheuddig was again promoted from his GM–12 position to the position of Housing Project Manager, at GM–13. After serving in this capacity for two years, Scheuddig

---

*Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (a court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past *as well as bar like discrimination in the future"*) (emphasis added).

**6.** The calculation of Brown's entitlement during the entire period for which relief is sought should include all "step increases" he would have received, beginning April 14, 1976. This entitlement differs from the compensation Mr. Scheuddig actually received because Mr. Scheuddig was recruited from outside the Army, and was therefore not entitled to step increases, which accrue only to employees holding "career status." Had Brown been chosen for the position from within the Army, he would have obtained career status on April 14, 1976, and would accordingly have been entitled to appropriate step increases commencing on that date.

**7.** Scheuddig was a GS–12 at the time.

**8.** The Army suggests that Scheuddig did not regard himself as qualified for the position. Defendant's Response to the Court's Order for an Evaluation of Relief Available to Plaintiff at 3.

**9.** *See* Affidavit of Thomas E. Wilwerth (exhibit 11 to plaintiff's materials); Letter to Joseph Sellers from Timothy J. Cochis, dated June 15, 1988 (exhibit 12 to plaintiff's materials).

**10.** It is also worth noting that the Army's contention—that the person actually chosen for the permanent position was more qualified than Brown—lacks support in the record. It appears that the Army failed to maintain any documents relating to the application process or the person chosen as the permanent Housing Project Manager. Under these circumstances, it is appropriate to draw inferences adverse to the party responsible for any evidentiary gaps in the record. *See Alexander v. Nat'l Farmers Org.,* 687 F.2d 1173, 1205–06 (8th Cir.1982); *Nat'l Ass'n of Radiation Survivors v. Turnage,* 115 F.R.D. 543, 557 (N.D.Cal.1987).

was involuntarily reassigned to the position of Supervisory Housing Management Specialist, also at GM–13, on June 26, 1986. The record indicates that Scheuddig's reassignment—from one GM–13 level position to another—occurred as a result of an error by the Civilian Personal Office. A year later, after the error was discovered, another individual was hired to fill the GM–13 position to which Scheuddig had been mistakenly reassigned, and Scheuddig was once again downgraded (apparently voluntarily) to a GS–12 position. Brown contends that, unlike Scheuddig, he would have stood his ground; he argues that he would have forced the Army to retain him in a GM–13 position. Accordingly, Brown asks that his remedy not reflect Scheuddig's reassignment to GS–12; he asks that his compensation for the pertinent period be set continuously at GM–13, and that he be placed at a GM–13 position by way of a prospective remedy.

The Court agrees with Brown. Although the Court lacks Brown's confidence in his ability to influence a recalcitrant bureaucracy, the Court is also of the opinion that it would be unfair to saddle Brown with the Army's error. Moreover, it would be unfair to limit Brown's remedy because of Scheuddig's voluntary acceptance of a downgrade to GS–12. It seems unlikely that an employee of Brown's aggressiveness would voluntarily accept any downgrade, particularly one necessitated by the Army's error. While it may be unlikely that Brown's opposition alone would have convinced the Army of the error of its ways, the fact of his likely opposition, coupled with the unfairness of including the Army's mistake in the formulation of his remedy, suggest that Brown's career path should diverge from Scheuddig's in this respect.

The sum of the foregoing is as follows. To account for the position he was improperly denied, Brown's compensation shall reflect a promotion to GS–9, effective August 21, 1975. From that date on, his career path shall track Scheuddig's, with the ex-ceptions noted above. Brown shall be compensated as if he had been promoted to GS–11, effective October 1, 1978, and as if he had been promoted to GS–12, effective June 7, 1981. He shall be compensated as if he had been promoted to GM–13 on May 23, 1982, and as if he had been compensated at that level ever since. Brown's compensation shall take the form of back pay: he shall be entitled to such income as he would have received absent the discrimination, less any income actually earned during this period.[11]

### B. Prejudgment Interest on the Back Pay Award

Brown seeks prejudgment interest on the back pay to be awarded under the preceding section. The Army contests his entitlement to such interest, citing *Loeffler v. Frank*, —— U.S. ——, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), and *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). Broadly put, these cases represent the principle that, absent an express statutory waiver, sovereign immunity protects the federal government from liability for prejudgment interest on damage awards. *See also United States v. New York Rayon Importing Co.*, 329 U.S. 654, 659, 67 S.Ct. 601, 604, 91 L.Ed. 577 (1947) ("The consent necessary to waive the traditional immunity [against interest] must be express, and it must be strictly construed."). Both *Frank* and *Shaw* also recognize that Title VII does not itself contain an express consent to the assessment of prejudgment interest against the federal government.

Brown claims that the Back Pay Act, 5 U.S.C. § 5596, constitutes Congress' express waiver of sovereign immunity in this context. That statute grants federal employees the right to receive back pay when they have been affected by "an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances or differentials of the employee." *Id.* at § 5596(b)(1). The Back Pay Act defines a

---

11. Brown agrees that the Army shall calculate the amount of back pay, and that he will accept the Army's figures so long as they are adequately documented.

"personnel action" to include "the omission or failure to take an action or confer a benefit." *Id.* at § 5596(b)(4). If an employee is entitled to an award under the statute, § 5596(b)(2)(A) provides that the award of back pay "shall be payable with interest."

It is manifestly apparent that Congress intended the Back Pay Act to waive the sovereign immunity that would otherwise preclude (1) the award of back pay as to certain "personnel actions," and (2) the assessment of prejudgment interest on such an award. It is less clear, however, that Congress intended that the failure to grant a promotion—even if wrongful—would invoke the protections of the Back Pay Act. Certainly, prior to the amendments wrought by the Civil Service Reform Act of 1978 (the "CSRA"), courts construed the Back Pay Act to exclude wrongful failures to promote from its coverage. This construction was based on the fact that a failure to promote was not seen to result in the "withdrawal or reduction of all or part of [an employee's] pay, allowances, or differentials." *See United States v. Testan,* 424 U.S. 392, 406, 96 S.Ct. 948, 957, 47 L.Ed.2d 114 (1976); *McNutt v. Hills,* 426 F.Supp. 990, 1002 (D.D.C.1977) (Richey, J.).

Brown seeks to evade this result by suggesting that the CSRA's expansion of the term "personnel action" to include "the omission or failure to take an action or confer a benefit" supersedes prior interpretations of the Back Pay Act, and brings the Army's failure to promote him within the scope of the statute. The Court must disagree.

The Court reads the CSRA's amendment as merely broadening the class of wrongful administrative actions which will trigger the Back Pay Act. The CSRA's amendment, however, does not broaden the *effect* which must be shown in order to trigger the Back Pay Act: the "withdrawal or reduction" of an employee's compensation. Contrary to Brown's suggestion, the decisions in *Testan* and *McNutt* had the effect of excluding wrongful failures to promote from the statute because such actions, even if wrongful, do not "withdraw" or "reduce" an employee's compensation.[12] *See Testan,* 424 U.S. at 407, 96 S.Ct. at 957–58 ("[T]he Back Pay Act, as its words so clearly indicate, was intended to grant a monetary cause of action only to those who were subjected to a *reduction* in their duly appointed emoluments or position.") (emphasis added). The CSRA's amendment does not alter this analysis in the least. While the CSRA may have expanded the actions (or, more accurately, failures to act) which may *produce* the requisite effects, the requirement that those effects actually be shown remains unchanged. This is the point at which Brown's argument fails. Because a wrongfully withheld promotion does not result in a "withdrawal or reduction" in an employee's compensation—even if it may constitute a "personnel action"— Brown is not entitled to prejudgment interest pursuant to the Back Pay Act.[13]

## C. *Permanent Injunction Against Further Reprisals*

▮ The final aspect of the relief which Brown seeks is a permanent injunction against future reprisals: Brown claims

---

**12.** In *Testan,* the Supreme Court noted that the Back Pay Act expressly avoids any intrusion into the federal government's traditional discretion "in determining most matters relating to the terms and conditions of federal employment." 424 U.S. at 406, 96 S.Ct. at 957. The Court continued:

> One continuing aspect of this is the rule, mentioned above, that the federal employee is entitled to receive only the salary of the position to which he was appointed, even though he may have performed the duties of another position *or claims that he should have been placed in a higher grade.* Congress did not override this rule, or depart from it, with its enactment of the Back Pay Act. It could

easily have so provided had that been its intention.

424 U.S. at 406, 96 S.Ct. at 957 (emphasis added).

**13.** To the extent the Court's decision conflicts with the results reached in *Parker v. Burnley,* 693 F.Supp. 1138 (N.D.Ga.1988), and *Rollins v. Bennett,* 48 FEP Cases 1172 (W.D.Wash.1988), the Court respectfully disagrees with those decisions. Neither case discussed the rationale of its decision in any detail, and, absent a compelling elaboration by either court, this Court is compelled to part ways with its brethren on this issue.

that during the pendency of this action the Army stymied his career progress as punishment for his having instituted this and other challenges to the Army's behavior.

Once a statutory violation is found, the issuance of an injunction against future discriminatory actions is by no means mandatory under Title VII. *See Johnson v. Brock,* 810 F.2d 219, 225–26 (D.C.Cir.1987). Nevertheless, the long history of Brown's struggle with the Army, and the Army's repeated unwillingness to accord Brown the equal treatment that is his due, convince the Court that an injunction against future reprisals is appropriate in this case. *See Johnson,* 810 F.2d at 225 (injunction "typical" remedy under Title VII). The Court is concerned that, absent such an injunction, the Army's mistreatment of Brown will continue, albeit in subtle ways that may beyond immediate judicial supervision. The Court thus exercises its discretion in favor of Brown's requested injunction.

The Court shall issue an Order consistent with the foregoing.

## ORDER

In accordance with the Opinion of the Court issued on this date, it is by the Court, this 11th day of May, 1989,

ORDERED, that the plaintiff shall have judgment against the defendant for back pay in an amount, to be computed by the defendant, which reflects a retroactive promotion to GS–9, effective August 21, 1975, a retroactive promotion to GS–11, effective October 1, 1978, a retroactive promotion to GS–12, effective June 7, 1981, a retroactive promotion to GM–13, effective May 23, 1982, and compensation at GM–13 from May 23, 1982, to the present, all less amounts actually earned during the above period; and it is further

ORDERED, that the plaintiff shall for all purposes be deemed to have been promoted to the above levels on the above dates, including the computation of any pertinent cost-of-living allowances; and it is further

ORDERED, that the defendant shall place the plaintiff in a GM–13 position in his area of expertise, with the compensation and benefits appropriate to such a position; and it is further

ORDERED, that plaintiff shall be deemed to have received a career appointment on April 14, 1976, and defendant shall make all reasonable efforts to shift all Social Security (FICA) contributions made on behalf of the plaintiff between April 14, 1976, and April 27, 1980, to the Civil Service Retirement Fund, with any additional payments that may be required from the employer to be made by the Army, and any additional payments that may be required from the employee to be withheld from the back pay award described above; and it is further

ORDERED, that defendant shall be permanently enjoined, from the date hereof, from engaging in any acts or omissions on account of the plaintiff's race, or in reprisal for the plaintiff's having instituted this or any other action.