William F. McNUTT, Plaintiff,

v.

Carla A. HILLS et al., Defendants.

Civ. A. No. 75–1422.

United States District Court, District of Columbia.

Jan. 31, 1977.

---

5. Plaintiff was not satisfied with the stipulation and desired to offer evidence before submitting this case to the Court. Defendants, however, made no such offer.

Donald H. Green, Greer S. Goldman, Nancy H. Hendry, Washington, D. C., for plaintiff.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Derek I. Meier, Asst. U. S. Attys., Washington, D. C., for defendants.

MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

In this civil action, plaintiff William F. McNutt charges the governmental defendants with unlawful discrimination against,

and a failure to meet affirmative obligations toward, physically-handicapped employees of the United States Department of Housing and Urban Development (HUD), in violation of certain federal statutes, regulations, and guidelines.[1] On his own behalf, McNutt, a HUD employee, seeks declaratory and injunctive relief and back pay. He also seeks declaratory and injunctive relief to be applicable on a department-wide level.[2]

On February 4, 1976, the parties submitted the administrative record in this case to the Court and stipulated "that no further factual development is necessary [and] that this action may be decided by the court on the basis of the administrative record as filed." Subsequently, the government filed a motion to dismiss, or in the alternative, for summary judgment, and plaintiff filed a cross-motion for summary judgment. Oral argument on those motions having been heard, the motions are now before the Court and ripe for decision.

## I. FACTUAL BACKGROUND

Plaintiff McNutt is legally blind, a victim of the disease retinitis pigmentosa. Despite his physical handicap, plaintiff earned a college degree and passed the Federal Service Entrance Examination Management Intern test in 1966. He was hired by HUD in June 1967 as an urban intern, at a GS–7 level. Upon completion of his one-year internship, plaintiff was promoted to the GS–9 level and became a permanent HUD employee. After some difficulty obtaining a placement assignment, he was placed in the Office of Congressional Services for Model Cities; he was not, however, formally transferred to that office and, as a result, his immediate supervisors did not have the authority to evaluate his work for purposes of a promo-

tion. In June 1969 he received a step increase to GS–9, step 2. Shortly thereafter, plaintiff suffered what he characterizes as "the most blatant discrimination of his career at HUD,"[3] arising out of a statement made by the Director of the Office of Congressional Services which, as the government concedes, was "inexcusable."[4] Subsequently, in October or November of 1969, plaintiff was transferred on less than twenty-four hours' notice from the Office of Congressional Services to the Administrative Division of the Model Cities Administration. Although he was dissatisfied with the series of administrative positions he held in the Administrative Division and regularly sought reassignment, he received promotions to GS–11 in March 1970 and to GS–12 in April 1971. He later received step increases, two in 1972 and one in 1973.

When plaintiff became eligible for promotion to GS–13 in April 1972, HUD was operating under a promotions freeze. The freeze ended in June 1972, and plaintiff increased his efforts to obtain a promotion. He was unsuccessful over the course of the following year and, pursuant to HUD procedures, filed an informal grievance in the summer of 1973. After efforts at informal resolution failed, plaintiff filed a formal grievance on March 4, 1974, with the Assistant Secretary for Community Planning and Development at HUD.[5] Plaintiff alleged, inter alia, that:

> Executive Orders, Equal Employment Opportunity laws, CSC directives, and Departmental policy statements ostensibly designed to establish the mechanisms, strategies and commitments to make EEO for the Physically Handicapped a reality have been abandoned here in HUD. . . . [I]n my case it goes beyond the aspects of a deliberately inop-

1. See § II infra.

2. Plaintiff did not bring this action as a class action and does not seek back pay for other employees of HUD who may have been harmed by the alleged discrimination.

3. Plaintiff's brief of March 25, 1976, at 5.

4. Defendants' brief of February 20, 1976, at 5. The incident is discussed more fully at n.32, infra.

5. Administrative Record (hereinafter, "Record"), Exhibit 1.

erative policy or program for, in reality, management's distorted perception, lack of acceptance and insecurities regarding my handicap have unjustly relegated me to the professional and social status of "misfit." [6]

Plaintiff specifically requested retroactive promotion from July 1, 1972, and reassignment to a more challenging job which would also provide an opportunity for career development and advancement. On August 5 and 6, 1974, a Grievance Examiner conducted a formal adjudicatory hearing on plaintiff's grievance. Two months later, the Grievance Examiner issued an opinion in which he found that HUD had discriminated against the plaintiff because of his physical handicap:

It has not so much been overt and hostile discrimination, but rather a failure by HUD to meet its obligations under statutes, policies, statements, the Federal Personnel Manual and other documents which relate to a Federal agencies [sic] responsibility toward handicapped employees. [7]

The Grievance Examiner recommended that plaintiff be promoted to GS–13, retroactively from the date of the filing of his formal grievance, March 4, 1974. The Examiner also recommended that HUD take steps to insure that plaintiff be provided with readers and special equipment for visually handicapped employees. Concerning department-wide policy, the Examiner wrote:

[The Rehabilitation Act of 1973] requires the agencies to submit an affirmative action program to the Civil Service Commission for the hiring, placement, and advancement of handicapped individuals in that department or agency. HUD's submission was made in March, 1974. Apart from this submission there is in effect no affirmative action program

within HUD. . . . What is needed is a candid introspection by HUD and then the establishment of an honest affirmative action program which amounts to more than rhetoric and required submissions to the Civil Service Commission. [8]

The Grievance Officer charged with reviewing the Examiner's findings, the aforementioned Assistant Secretary for Community Planning and Development, declined initially to issue a decision in the case; instead, on October 18, 1974, he transmitted the grievance file to the Under Secretary of HUD, in light of "the implications as to precedents set for other handicapped persons, and policy that may be set for the Department by the decision rendered." [9] On October 27, 1974, plaintiff was promoted to the position of Program Assistant in the Federal Insurance Administration of HUD. He accepted the promotion with the understanding that his acceptance would not in any way affect his rights under the grievance proceeding. [10] On November 5, 1974, the Under Secretary returned plaintiff's file to the Assistant Secretary for "final disposition," and indicated in a memorandum to the Assistant Secretary that the promotion accorded plaintiff the relief sought to the fullest extent permitted by law. [11] A final disposition was prepared and, on November 17, 1974, the Under Secretary issued findings consistent with the memorandum of November 5, 1974. Specifically, the Under Secretary found that "the relief you have sought has been granted to the fullest extent justifiable." Accompanying this finding was the conclusion that "there is no authority under applicable statutory or regulatory provisions for retroactive pay in a grievance ·case. . . . Moreover, I do not find that your request for retroactive pay is justified." As to those aspects of the Hearing Examiner's

---

6. *Id.*, p. 3.

7. Record, Exhibit 15, p. 8.

8. *Id.*, p. 11.

9. Record, Exhibit 25 ("Abstract of Secretarial Correspondence"). The Assistant Secretary

did, however, recommend that plaintiff be promoted to a GS–13 position.

10. Record, Exhibit 18.

11. Record, Exhibit 20.

opinion concerning department-wide affirmative action for the physically handicapped, the Under Secretary noted that "these issues were not part of your original grievance and . . . I do not find them germane to the resolution of this case." The Under Secretary did note, however, that he had instructed the Assistant Secretary for Programs for the Elderly and the Handicapped to "look into the Department's policies . . . and inform me of any suggestions she may have."[12]

The instant suit was filed on August 28, 1975. Plaintiff seeks a declaratory judgment that he was discriminated against by the defendants, an injunction prohibiting future discrimination, retroactive promotion, back pay, and an order requiring defendants to prepare and implement an affirmative action program for the physically handicapped at HUD.

## II. APPLICABLE STATUTES AND REGULATIONS

In alleging that the government has discriminated unlawfully against him and others who are physically handicapped, plaintiff relies on a variety of overlapping federal statutes, regulations, and personnel directives. A brief description of those provisions is set forth by the Court in this section.

Congress first acted to combat federal employment discrimination against the physically handicapped in a 1948 statute:

The President may prescribe rules which shall prohibit, as nearly as conditions of good administration warrant, discrimination because of physical handicap in an Executive agency or in the competitive service with respect to a position the duties of which . . . can be performed efficiently by an individual with a physical handicap. . . .

5 U.S.C. § 7153 (1970). Civil Service Commission regulations enacted in 1969 pursuant to this statutory authority[13] provide, in pertinent part:

In determining the merit and fitness of a person for competitive appointment . . . an appointing officer shall not discriminate on the basis of . . . a physical handicap with respect to any position the duties of which may be efficiently performed by a person with the physical handicap.

5 C.F.R. § 713.401 (1976).

In 1969, pursuant to 5 U.S.C. § 7153 and various presidential policy statements,[14] the Civil Service Commission (CSC) also formulated the original version of its Selective Placement Program for the Physically Handicapped, which appears in its present form in the Federal Personnel Manual (FPM), ch. 306, subch. 4 (1969). Federal selective placement programs are defined by the CSC as "organized action plans and procedures developed . . . [to] provide the framework for Federal agency implementation of law and executive branch policy on employment and utilization of the handicapped in the Federal civil service." The programs are designed to emphasize "selective placement (the careful matching of the abilities of the handicapped persons with the duties of particular positions) and personnel management practices which provide continuing accommodation to handicapped personnel after initial employment." *Id.,* subch. 1, at 306–3. The CSC places the burden upon agency heads to assure overall responsibility for selective placement programs in their respective agencies. *Id.* at 306–4. Agency programs are to be run, according to the Manual, by an in-house coordinator, but the program is to receive the "full cooperation of the entire management team down to and including the first-line supervisor." *Id.,* subch. 3, at 306–9. The selective placement program specifically for the physically handicapped requires agency coordinators to provide the following types of assistance, *inter alia,* as needed

---

12. Record, Exhibit 28.

13. *See* 34 Fed.Reg. 5367 (1969).

14. *See* Federal Personnel Manual, ch. 306, subch. 1, at 306–3 to –4 (1969).

by physically handicapped employees: (1) placement assistance within the agency, including referral to subordinate personnel or to supervisors; (2) work site modification to meet the special needs of the employee; and (3) job modification, including the reengineering of positions in accordance with the CSC's Maximum Utilization of Skills and Training (MUST) principle. *Id.,* subch. 4, at 306–14.

In 1973, Congress took action again to combat federal employment discrimination against the physically handicapped by enacting § 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (Supp. V 1975). Section 501's legislative history indicates that Congress was concerned that "despite the Civil Service Commission's experience and actions in this area, Federal employment policies with regard to handicapped individuals [continue] to be found wanting." S.Rep.No.93–318, 93d Cong., 1st Sess. 49 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2076, 2122. Accordingly, Congress established, in § 501(a) of the Act, 29 U.S.C. § 791(a), the Interagency Committee on Handicapped Employees [ICHE]. In § 501(b), 29 U.S.C. § 791(b), Congress directed each agency of the executive branch to prepare and submit to the ICHE and the CSC "an affirmative action program plan for the hiring, placement, and advancement opportunities for handicapped individuals."

As Congress' most recent effort in the field, § 501 was obviously designed to increase agencies' responsibilities toward physically handicapped employees. By requiring "the establishment of comprehensive affirmative action plans and annual reports," the Act obviously serves, in the CSC's words, "to expand the responsibilities of agencies in managing and implementing their [selective placement] programs." FPM Letter No. 306–5 (Jan. 28, 1974).

## III. JURISDICTION AND THE DEFENSE OF SOVEREIGN IMMUNITY

The parties, both in their memoranda and at oral argument, have focused much of their analysis on the difficult questions of whether plaintiff has stated a cause of action and whether the Court has jurisdiction over any such cause of action. Necessarily, much of the parties' analysis has concerned the applicability of the doctrine of sovereign immunity to this case. For the reasons set forth below, the Court concludes that jurisdiction and a cause of action exist, but that the relief the Court can provide is limited by the doctrine of sovereign immunity.

A. *The Court has Subject-Matter Jurisdiction Pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1361.*

■■■ It is important to keep in mind, at the outset, the nature of plaintiff's complaint. Plaintiff claims that he has been aggrieved by the defendants' past and continuing illegal conduct in discriminating against the physically handicapped, contrary to federal statutes and regulations, and by defendants' failure to meet certain statutory and regulatory obligations requiring affirmative action to combat that discrimination. He thus alleges, in effect, that he is suffering "legal wrong" and is "aggrieved by agency action." [15] Accordingly, he has stated a cause of action for judicial review of agency action under the judicial review provision of the Administrative Procedure Act (APA), 5 U.S.C. § 702.[16] *See*

---

15. "Agency action" includes an agency's "failure to act." 5 U.S.C. § 551(13). *See* 5 U.S.C. § 701(b)(2).

16. It seems clear that the appropriate scope of judicial review is supplied by the "arbitrary and capricious" test of 5 U.S.C. § 706(2)(A). The more stringent "substantial evidence" test would be applicable only "in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing

provided by statute." 5 U.S.C. § 706(2)(E). While there is an agency hearing under review in this case, there is no claim that the hearing was provided pursuant to §§ 556 or 557 or otherwise required by statute. *See Charlton v. United States,* 412 F.2d 390, 397–400 (3d Cir. 1969) (concurring opinion).

**998**

*Smith v. Fletcher,* 393 F.Supp. 1366, 1369 (S.D.Tex.1975) (cause of action under 5 U.S.C. § 702 for alleged violation of regulations prohibiting discrimination on the basis of physical handicap).[17] Moreover, in this circuit, "the APA constitutes an independent grant of jurisdiction and a waiver of sovereign immunity with respect to agency action covered by the Act . . . ." *Haneke v. Secretary of HEW,* 175 U.S.App. D.C. 329, 535 F.2d 1291, 1297 n.16 (1976) (APA jurisdiction would be available to review agency's denial of federal employee's reclassification request). *See Eastern Kentucky Welfare Rights Organization v. Simon,* 165 U.S.App.D.C. 239, 506 F.2d 1278, 1283 (1974), *rev'd on other grounds,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Pickus v. United States Board of Parole,* 165 U.S.App.D.C. 284, 507 F.2d 1107, 1109–10 (1974); *Scanwell Laboratories, Inc.*

*v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859, 873–74 (1970).[18]

Plaintiff also asserts jurisdiction under 28 U.S.C. § 1361, which provides for original jurisdiction in the district courts for "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The alleged duty, of course, arises from the statutes and implementing regulations which prohibit, and mandate affirmative steps to combat, discrimination on the basis of physical handicap in federal employment. The duty is also one "owed to the plaintiff," who, as a physically handicapped federal employee, stands to gain direct benefit from proper enforcement of the statutes and regulations in question.[19] The remedy provided by § 1361 has been interpreted by

17. *But see Ryan v. FDIC,* C.A. No. 75–1904 (D.D.C., Order of May 5, 1976), *appeal docketed,* No. 76–1634 (D.C.Cir. July 14, 1976). In *Ryan,* Judge Gesell found that "plaintiff's allegations of discrimination on the basis of physical handicap fail to state a cause of action under 5 U.S.C. § 7153, 29 U.S.C. § 791 . . . ." Plaintiff had alleged APA jurisdiction in her complaint. It should be noted, however, that Judge Gesell also found that plaintiff had failed to exhaust her administrative remedies; therefore, the case is distinguishable on the question of jurisdiction and cause of action under the APA.

18. The government has suggested that since this case involves, in large part, an agency's promotion and other employment practices, functions traditionally left to the discretion of the agency, the action complained of is unreviewable. Under 5 U.S.C. § 701(a), agency action "committed to agency discretion by law" is excluded from the judicial review provisions of the APA. To maintain the unreviewability of agency action allegedly in violation of the statutes and implementing regulations which prohibit discrimination against the physically handicapped and require affirmative action to combat such discrimination, see § II, *supra,* the government would have to maintain also that those statutes " 'are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). The government has made no such argument, however, and for good reason; for, it is clear to this Court that the statutes and regulations involved remove discrimination by reason of physical handicap

from within the borders of permissible discretion. To approach this question from a slightly different viewpoint, it is true that this case involves an area in which the responsible government officials are vested with considerable discretion; however, it is within this Court's power under the APA to determine if that discretion has been abused because a decision has been made "on an impermissible basis such as an invidious discrimination against a particular race or group or . . . on other 'considerations that Congress could not have intended to make relevant.' " *Wong Wing Hang v. Immigration and Naturalization Service,* 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.).

19. The government has not challenged plaintiff's standing to maintain this action. Plaintiff clearly alleges injury in fact from the agency's actions in question here. Specifically, he alleges that the agency's discrimination has hindered his career development. As a physically handicapped federal employee, he is, without question, within the zone of interests intended to be protected by the statutes and regulations involved in this case which forbid and combat employment discrimination against the physically handicapped in federal employment. *See Association of Data Processing Service Organizations, Inc., v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In addition, the injuries of which he complains are "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

this circuit as authorizing federal district courts "to issue appropriate corrective orders where Federal officials are not acting within the zone of their permissible discretion but are abusing their discretion or otherwise acting contrary to law. . . ." *Peoples v. USDA,* 136 U.S.App.D.C. 291, 427 F.2d 561, 565 (1970). To be sure, the mandamus remedy is an extraordinary one, to be used only with great caution in certain carefully-defined circumstances. *See Haneke v. Secretary of HEW,* 535 F.2d at 1296 & n.15. Thus, for example, the writ should be used only when the duty of the officer to act is clearly established and plainly defined; in addition, the plaintiff should exhaust all administrative remedies before seeking relief in the nature of mandamus. Mindful of these and other restraints, the Court is nevertheless convinced that plaintiff's allegations are such that, if they are proven, exercise of the mandamus remedy would be appropriate.[20] It is to be noted that the government has not put forward any arguments against the propriety of mandamus jurisdiction to obtain prospective relief in this case.[21] It should also be noted that "[s]overeign immunity has never been considered a bar to mandamus actions seeking 'to compel public officials to adhere to the duties imposed upon them in their official capacities.' " *Id.* at 1296 n.14.[22]

**B. Sovereign Immunity Bars the Award of Retroactive, But Not Prospective, Relief in this Case.**

When the government invokes the defense of sovereign immunity, the Court's inquiry does not end once it has determined that subject-matter jurisdiction exists (here under the APA and § 1361), for it is necessary, as one commentator has noted, "to separate two distinct issues often merged in sovereign immunity analysis—jurisdiction to entertain the suit and power to grant certain kinds of relief." C. Abernathy, *supra* note 22, at 345. The modern genesis of this two-stage approach to sovereign immunity analysis is the Supreme Court's opinion in *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). In *Larson,* the Supreme Court carved out two significant exceptions to sovereign immunity as a jurisdictional bar: (1) when a government official acts beyond his or her statutory authority, *see* note 22, *supra;* and (2) when a statute conferring certain power upon a government official is unconstitutional, *see Larson,* 337 U.S. at 689–91, 69 S.Ct. 1457. *See Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In delineating these exceptions, the Supreme Court nevertheless noted:

> Of course, a suit may fail, as one against the sovereign, even if it is claimed that

**20.** Since the Court is reviewing agency action in this case, a question arises as to the proper standard of review in such an action under § 1361. The authorities make it clear that reference back to the proper scope of review under the APA, see note 16, *supra,* is appropriate: "The scope of review, whether or not mandatory relief is sought, and whether or not it is sought through an action in the nature of mandamus or through mandatory injunction, should be governed by the scope of review provisions of the Administrative Procedure Act . . . ." K. Davis, *Administrative Law of the Seventies* § 23.09, at 543 (1976). *See Haneke v. Secretary of HEW,* 535 F.2d at 1296 n.15, 1299.

**21.** While it is true that a party's failure to assert jurisdictional objections cannot confer jurisdiction upon the federal courts, the failure of the government to object to plaintiff's characterization of the duties involved in this case as ones which, if violated, would make the exercise of the mandamus remedy appropriate

is "highly probative in determining whether mandamus will lie." *Haneke v. Secretary of HEW,* 535 F.2d at 1295–96 n.13.

**22.** In reaching this conclusion, one can view § 1361 as a statutory waiver of sovereign immunity. *See* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure,* § 3655, at 189 (1976). Another approach is to view properly-brought mandamus cases as falling within the so-called "*Larson-Dugan*" exception to the sovereign immunity doctrine for action by government officials beyond their statutory powers. *See Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). See also C. Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Discrimination Cases,* 10 Harv.C.R.–C.L.L.Rev. 322, 342–43 n.116 (1975).

the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.

*Larson,* 337 U.S. at 691 n.11, 69 S.Ct. at 1462 n.11. *See State of Washington v. Udall,* 417 F.2d 1310, 1317 (9th Cir. 1969); *AFGE Local 1858 v. Callaway,* 398 F.Supp. 176, 191 n.1 (N.D.Ala.1975).

In a much more recent case, *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court explicated the distinction between the jurisdictional and relief aspects of sovereign immunity. Plaintiffs in *Edelman* claimed that, by administering a federal-state welfare program under state regulations rather than pursuant to conflicting federal regulations, the defendant state officials violated federal law and the equal protection clause of the fourteenth amendment. The lower courts found for plaintiffs and awarded both prospective relief and retroactive payment of wrongfully withheld benefits. The Supreme Court reversed the judgment of the lower courts on the question of the payment of retroactive benefits, holding that despite the finding of unconstitutional action on the part of the state defendants, the state's eleventh amendment immunity [23] prevented the award of such retroactive compensation. In discussing the landmark case of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, in which the Court held that the eleventh amendment did not bar an action in the federal courts to enjoin a state official from enforcing an allegedly unconstitutional state statute, the *Edelman* Court noted:

> [T]he relief awarded in *Ex Parte Young* was prospective only . . .. Such re-

lief is analogous to that awarded by the District Court in the prospective portion of its order under review in this case. But the retroactive portion of the District Court's order here . . . stands on quite a different footing. . . . Addressing himself to a similar situation in *Rothstein v. Wyman,* [467 F.2d 226 (2 Cir. 1972)], Judge McGowan observed for the court:

> "It is not pretended that these payments are to come from the personal resources of these appellants. Appellants expressly contemplate that they will, rather, involve substantial expenditures from the public funds of the state . . ..

> "It is one thing to tell [a state official] that he must comply with the federal standards for the future . . .. It is quite another thing to order [that official] to make reparation for the past. The latter would appear to us to fall afoul of the Eleventh Amendment if that basic constitutional provision is to be conceived of as having any present force."

We agree with Judge McGowan's observations. The funds to satisfy the award in this case must inevitably come from the general revenues of the State . . . and thus the award resembles far more closely [a] monetary award against the State itself . . . than it does the prospective injunctive relief awarded in *Ex Parte Young.*

415 U.S. 664–65, 94 S.Ct. 1356 (citations omitted).

■ The *Edelman* opinion clearly indicates that the Court's "area of concern" in the immunity area is "payments from the government treasury." [24] Congress (or a state, in the eleventh amendment context) can, of course, waive the governmental im-

---

**23.** While the states' immunity as provided for in the eleventh amendment and the immunity of the federal government involved in this case are obviously different, their differences are not pertinent for purposes of the above discussion. *See* C. Abernathy, *supra* note 22, at 360–61 & n. 212.

**24.** C. Abernathy, *supra* note 22, at 352. The author suggests that the Supreme Court's approach to sovereign immunity, both in the jurisdictional and in the relief context, can be explained through analysis of the separation of powers doctrine. *Id.* at 353–68.

munity which bars suits seeking such payments. *See United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Edelman*, 415 U.S. at 673, 94 S.Ct. 1347. But, absent an explicit waiver, retroactive monetary relief would be unavailable, even for plaintiffs charging government officials with unconstitutional or *ultra vires* actions.

 In applying the law to the facts of this case, it is necessary first to identify the types of relief that plaintiff seeks. Prospectively, plaintiff seeks declaratory and injunctive relief that would be applicable both to him and to handicapped employees at HUD generally.[25] Certainly, such relief is contemplated both by the APA, *see* 5 U.S.C. § 703, and by 28 U.S.C. § 1361, *see Peoples v. USDA*, 427 F.2d at 565; *Testan*, 424 U.S. at 403,[26] 96 S.Ct. 948. In addition, despite whatever effect the granting of such relief might have on the federal treasury, it would not run afoul of the principles announced in *Edelman*. For, as the Court noted:

> [T]he fiscal consequences to state treasuries in [cases granting injunctive relief against state officials] were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex Parte Young* . . . ··

415 U.S. at 667–68, 94 S.Ct. at 1358. Plaintiff's request for back pay pursuant to retroactive promotion would, however, be barred by sovereign immunity under the principles discussed above, unless that im-

munity is waived. Such a waiver must be explicit: "a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Testan*, 424 U.S. at 399, 96 S.Ct. at 954. The question for the Court, therefore, is whether plaintiff has identified any such waiver which would enable him to obtain back pay.

 Preliminarily, it must be noted that neither the APA nor 28 U.S.C. § 1361, the statutes conferring jurisdiction in this case, constitutes a waiver of sovereign immunity for purposes of obtaining a retroactive award of salary. While the APA, as noted above, constitutes a general waiver of sovereign immunity for purposes of initial access to the Court in cases seeking judicial review of agency action, the APA, "by itself, is not a waiver of sovereign immunity in suits seeking money damages against the United States." *Scanwell Laboratories, Inc. v. Thomas*, 172 U.S.App.D.C. 281, 521 F.2d 941, 948 (1975), *cert. denied*, 425 U.S. 910, 96 S.Ct. 1507, 47 L.Ed.2d 761 (1976). *See Warner v. Cox*, 487 F.2d 1301 (5th Cir. 1974). As to § 1361, the recent *Testan* case precludes an award of back pay in this case. Plaintiffs in *Testan* sought back pay for allegedly improper classification of their jobs in the federal civil service. Although the Court indicated that the mandamus statute provided an avenue for prospective relief, it held that back pay was unavailable because of the lack of an explicit waiver of sovereign immunity. 424 U.S. at 403, 96 S.Ct. 948. *See* note 26, *supra*.

 Plaintiffs have urged the Court to find an implied remedy for back pay in the various statutes and regulations prohibiting and combating discrimination against the physically handicapped in federal employment. Jurisdiction under this theory would be provided by 28 U.S.C. § 1331 (federal question). Again, the *Testan* case is instructive. Plaintiffs in *Testan*, federal

---

25. *See* § I, p. 5, *supra*.

26. In *Testan*, the Supreme Court found that a federal employee seeking back pay for allegedly improper classification could not obtain such retroactive relief. The Court indicated, however, that the mandamus statute would appear

to offer an avenue for prospective relief: "A second possible avenue of relief—and it, too, seemingly, is only prospective—is by way of mandamus, under 28 U.S.C. § 1361, in a proper federal district court." 424 U.S. at 403, 96 S.Ct. at 956.

employees who alleged that their jobs were improperly classified, argued that the Classification Act, 5 U.S.C. §§ 5101–5115 (1970), established a cause of action for back pay. While the stated purpose of the Act was to ensure that "the principle of equal pay for substantially equal work would be followed," 5 U.S.C. § 5101(1)(A), and while, in the Supreme Court's words, employees had "an administrative avenue of prospective relief available to them under the elaborate and structured provisions of the . . . Act," 424 U.S. at 403, 96 S.Ct. at 955, the Court found, "no provision in the Classification Act that expressly makes the United States liable for pay lost through allegedly improper classifications." *Id.* at 399, 96 S.Ct. at 954. Accordingly, the Court held there had been no explicit waiver of sovereign immunity, and plaintiffs could not therefore maintain their suit for back pay. The situation is much the same in the instant suit. The provisions discussed in § II, *supra*, prohibit federal employment discrimination against the physically handicapped and impose certain affirmative obligations on the part of the federal government. But there is not even a hint, much less an explicit statement, of the right of an aggrieved federal employee to seek a back pay award to compensate him or her for being the victim of discrimination.[27] Therefore, the Court concludes that the provisions in question are of no assistance to plaintiff in his attempt to obtain back pay for the alleged discrimination he has suffered.

Plaintiff has also asserted the Back Pay Act, 5 U.S.C. § 5596 (1970), as another basis for his cause of action. The Supreme Court's recent interpretation of that Act, again in *Testan*, would seem to preclude a reading of the Act which would be favorable to plaintiff. The very terms of the Act apply to federal employees who "have undergone an unjustified or unwarranted personnel action that has resulted in the *withdrawal* or *reduction* of all or a part of [their] pay, allowances, or differentials . . . ." 5 U.S.C. § 5596(b) (emphasis added). As the Supreme Court explained in *Testan*, the Act was intended to provide certain standards in an area traditionally committed to the sound discretion of agency supervisors by providing "for the award of money damages for a wrongful deprivation of pay." 424 U.S. at 406, 96 S.Ct. at 957. The Act was not, however, intended to be a general limitation of the traditional discretion afforded agency supervisors:

> [F]ederal agencies continue to have discretion in determining most matters relating to the terms and conditions of federal employment. One continuing aspect of this is the rule, mentioned above, that the federal employee is entitled to receive only the salary of the position to which he was appointed, even though he may have performed the duties of another position *or claims that he should have been placed in a higher grade*. Congress did not override this rule, or depart from it, with its enactment of the Back Pay Act. It could easily have so provided had that been its intention.

*Id.* (emphasis added). The Court's conclusion was thus inescapable: "[T]he Back Pay Act, as its words so clearly indicate, was intended to grant a monetary cause of action only to those who were subjected to a reduction in their duly appointed emoluments or position." *Id.* at 407, 96 S.Ct. at 956. In this case, plaintiff does not claim that he was subjected to such a reduction; rather, he claims that "he should have been placed in a higher grade." Under the holding of *Testan,* the Back Pay Act is therefore of no assistance to him.[28]

---

**27.** The Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e–16, –17 (Supp. V 1975), *amending* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–15 (1970), is an example of an explicit waiver of sovereign immunity. *See United States v. Testan*, 424 U.S. 392, 406 n.8, 96 S.Ct. 948, 47 L.Ed.2d 114 (1974); *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). The Act does not apply, however, to discrimination against the physically handicapped, as it proscribes only discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–16(a).

**28.** Plaintiff has briefly mentioned the Tucker Act, 28 U.S.C. § 1346 (a)(2), in the sections of his complaint and briefs dealing with jurisdic-

There being no other statutes which even arguably constitute an explicit waiver of sovereign immunity applicable to this case, the Court must conclude that back pay is not available to redress discrimination against the physically handicapped. This is not to say, however, that *all* corrective personnel actions would be inappropriate. As noted above, the Supreme Court indicated in *Testan* that the mandamus statute seemingly provided the individual employee with an avenue for prospective relief, specifically prospective reclassification. In fact, government attorneys in *Testan* indicated that if the plaintiffs sought such relief in a mandamus action in federal district court, the government " 'will not contest the district court's jurisdiction to entertain respondent's claim for prospective equitable relief.' " *Id.* at 401 n. 5, 96 S.Ct. at 955 n. 5. Under this rationale, assuming that discrimination is established, plaintiff may be entitled to prospective relief that would place him in the position he would have attained by this time had he not been the victim of discrimination.

\* \* \* \* \* \*

Summarizing the Court's conclusions on the issues dealt with in this section of the opinion, the Court finds that: (1) jurisdiction over this case exists pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1361; (2) sovereign immunity does not bar the granting of prospective relief in this case, including prospective promotion; but, (3) sovereign immunity bars an award of back pay.

## IV. JUDICIAL REVIEW ON THE MERITS

Having decided the threshold issues, the Court turns to judicial review of the merits of the final agency decision in this case. This latter task is less complex than the former, mainly because of the somewhat summary nature of the final agency decision. The Court will first consider the decision as it applies to the individual plaintiff and will then review the decision as it applies on a department-wide level.

A. *The Final Agency Decision, as Applicable to the Individual Plaintiff, is Flawed in Part, Under the Appropriate Judicial Review Standard, and Must be Remanded for a Determination on the Question of Prospective Promotion.*

As noted in § I, *supra,* the Grievance Examiner found that plaintiff McNutt had been discriminated against on the basis of his physical handicap and recommended retroactive promotion to GS–13 and an award of back pay. The finding of discrimination is amply supported by the record in this case. In fact, had the Under Secretary reached a contrary conclusion after reviewing the Grievance Examiner's finding, it would have been difficult to justify such a conclusion. The fact is, however, that in the final agency decision, the Under Secretary did not dispute the Grievance Examiner's finding of discrimination against the plaintiff. Rather, as noted in § I, *supra,* the Under Secretary found merely that "the relief that you have sought has been granted to the fullest extent justifiable" because of plaintiff's promotion to a GS–13 position while the grievance proceeding was pending.[29] The Under Secretary concluded that there "is no authority" for an award of retroactive pay and that, in any case, "I do not find that your request for retroactive

---

tion. The Court does not believe that it was plaintiff's intention to assert that the Tucker Act provides a cause of action in this case. If that were the case, the Court would reject the contention: "The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . We therefore must determine whether . . . other federal statutes . . . invoked by the respondents confer a substantive right to recover money damages from the Unit-

ed States for [the wrong alleged]." *Testan,* 424 U.S. at 398, 96 S.Ct. at 953.

29. Record, Exhibit 28. The Court's conclusion that the final agency decision did not dispute the Grievance Examiner's finding of discrimination is borne out by the government's memorandum in support of its motion to dismiss, in which plaintiff's promotion to GS–13 is characterized as the agency's "final disposition of [plaintiff's] grievance." Defendants' brief of Feb. 20, 1976, at 1–2.

pay is justified."[30] Thus, despite the undisputed finding of discrimination, the Under Secretary took no further action.

The Court is thus faced, initially, with the question of whether the Under Secretary's legal conclusion that no further relief *could* be afforded plaintiff was correct or was, instead, "not in accordance with law." 5 U.S.C. § 706(2)(A). That question was answered implicitly by the Court in § III, *supra* : The Under Secretary was correct in concluding that an award of back pay was not possible, but he was incorrect in concluding that all further relief was therefore impossible, for the remedy of prospective promotion, which would place plaintiff in the position he would have reached but for the discrimination he suffered, is available.

· **[19]** The Court is also faced with the Secretary's apparent determination, *see* note 30, *supra,* that retroactive promotion and back pay (and, implicitly therefore, prospective promotion) would not be justified on the facts of plaintiff's case. No reasons were given for this determination, undoubtedly because the Under Secretary also believed that, in any case, he was not empowered to authorize such relief. The latter conclusion was, as noted above, incorrect. His one-sentence determination on the facts must also be rejected, not as necessarily wrong, but as "arbitrary" and "capricious" within the meaning of 5 U.S.C. § 706(2)(A) because no reasons for the conclusion were given. *See National Association of Food Chains, Inc. v. I.C.C.,* 175 U.S.App.D.C. 346, 535 F.2d 1308, 1313–15 (1976).

The Court could attempt to determine on its own what position plaintiff would have reached but for the discrimination he has suffered. However, the Court does not believe the record contains enough information to permit such a determination. The Court notes, for example, that in making the related determination that retroactive promotion was justified (a determination that was reversed in one sentence by the Under Secretary), the Grievance Examiner admitted that he fixed the date of retroactive promotion "fairly arbitrarily" because of the absence of "specific and identifiable acts of discrimination"[31] in plaintiff's case. The Court is thus left without detailed consideration of the question on *any* level within the agency.

 In these circumstances, the Court believes it appropriate to remand this case to the agency for the limited purpose of determining whether and to what extent plaintiff is entitled to prospective promotion. The agency proceeding should be similar to the original proceeding: There should be an adversary hearing before a grievance examiner with subsequent review by appropriate agency officials. The issues on remand, of course, will be much narrower. The parties and the grievance examiner should take as established that which the agency has not disputed—that plaintiff was the victim of discrimination. The discrimination which the grievance examiner originally found, which the agency did not dispute, and which this Court has affirmed on review, apparently dates from the early years of plaintiff's employment at HUD.[32]

**30.** Record, Exhibit 28. The Under Secretary's comment that he did not find an award of retroactive pay to be justified seems to be the only instance in which he disputed the Grievance Examiner's finding as to plaintiff's individual complaint. While no elucidation of the precise meaning of the Under Secretary's observation is offered in the final agency decision, the government's briefs in this Court would seem to support an interpretation to the effect that the Under Secretary was not convinced that plaintiff would have been promoted but for the discrimination he suffered: "There is nothing in the record which in any way indicates that but for alleged handicap discrimination plaintiff would have been promoted to a GS–13

position any sooner than October 27, 1974." Brief of Feb. 20, 1976, at 7.

**31.** Record, Exhibit 15, p. 13.

**32.** The grievance examiner found that at the point plaintiff was promoted to GS–9 in June 1968 and assigned to a position in Congressional Services for Model Cities, HUD "began to mishandle the Grievant's personnel actions in their failure to take cognizance of his handicap and assist him in overcoming it." Specifically, the examiner found:

Mr. McNutt was never really assigned to Congressional Services. Instead, he was retained on the rolls of the Office of Personnel.

However, plaintiff does not claim that the discrimination interfered with his ability to obtain promotions until July 1, 1972. Accordingly, *the narrow inquiry on review should be: on what date, on or after July 1, 1972, would plaintiff have been promoted to GS–13 but for the discrimination he suffered?* The burden is on the government—that is, for each time that plaintiff applied for and was denied a promotion on or after July 1, 1972, the government must show by "clear and convincing evidence" that plaintiff would not have gotten the position applied for in any event, even absent discrimination. *Cf. Day v. Mathews,* 174 U.S.App. D.C. 231, 530 F.2d 1083, 1085 (1976).[33] The examiner must conclude that plaintiff would have been promoted on the date of the earliest of those denials, if any, as to which the government is unable to sustain its burden. Assuming such a date is determined and that it is before October 27, 1974 (when plaintiff was actually promoted to GS–13), the examiner should next determine the personnel position that plaintiff would now occupy had he been promoted on that date. Step increases should be taken into account in this latter determination.

> Obviously, this was a detriment to him because the people he was working for did not have the authority to evaluate his work and effectuate a promotion. He was the last person in his intern class to be accepted under a permanent ceiling slot. There is testimony on the record . . . that Mr. McNutt performed his job satisfactorily. There is hearsay testimony, which was never controverted by HUD (and the fact it was said was substantiated by both oral testimony and written submissions to the record) which indicates that the Director of the Office of Congressional Services wanted to remove certain employees from his office. When asked who these people were, he is said to have said McNutt was one of them. He did not want McNutt to be "wandering and stumbling around the halls of Congress."
>
> . . . . .
>
> At no point did Mr. McNutt receive any guidance from the Department concerning his handicap. Instead, he was detailed out of Congressional Services to an administrative position in Model Cities [in October or November of 1969].

*Id.,* at 3–4. The Grievance Examiner's findings bear on the agency's failure to meet its statutory and regulatory obligations toward the physi-

If the grievance examiner's conclusion is that plaintiff would have attained a position higher than his current station, the examiner should recommend that plaintiff be promoted prospectively to that higher level and that he receive prospectively all of the benefits of that position.

Inasmuch as plaintiff will not be able to receive any retroactive relief, it is incumbent upon the agency to expedite the remand determination. Accordingly, the Court will require that the proceeding be completed within 120 days of the date of this opinion and accompanying order. Should plaintiff desire to seek judicial review of the agency's determination, he will be able to petition the Court to re-open the case for those purposes.

B. *The Final Agency Decision, as Applicable on a Department-Wide Level, is Entirely Unresponsive to Plaintiff's Grievance and the Findings of the Grievance Examiner and is Therefore Arbitrary and Capricious.*

In dealing with the issue of departmental policy toward the physically handi-

cally handicapped, which are discussed in § II, *supra.* While the Rehabilitation Act of 1973 obviously would not have been in effect during the early stages of plaintiff's employment, the agency would have been bound, at least during a portion of plaintiff's tenure at Congressional Services, by both the Selective Placement Program for the Physically Handicapped, promulgated in its original form in July 1969, and by 5 C.F.R. § 713.401, promulgated in March 1969. *See* § II, *supra,* particularly notes 13 and 14, *supra,* and accompanying text.

**33.** Although *Day* established standards for the determination of relief in Title VII cases, the principles of *Day* dictate that the government bear the burden in this case as well. As in *Day,* it is true here that " 'it is now impossible for an individual discriminatee to recreate the past with exactitude.' " And, again as in *Day* and regardless of the *type* of discrimination involved, "it is only equitable that any . . . uncertainty be resolved against the party whose action gave rise to the problem." Finally, as the *Day* court pointed out, "This allocation of the burden is also in accord with the principle placing upon a party the burden of proving facts peculiarly within its own knowledge." 530 F.2d at 1086 & n. 5.

capped, the Under Secretary wrote in the final agency decision:

> I note that the Hearing Examiner raised the issues of " . . . establishing an honest affirmative action program . . . and implementing the Civil Service Commission Program."

> Though these issues were not part of your original grievance and though I do not find them germane to the resolution of this case, I would like to indicate the following points:

> . . . . .

> —The CSC has approved the Department's Affirmative Action Program as complying with the Commission's requirements.

> —I have instructed the Assistant Secretary for Programs for the Elderly and the Handicapped to look into the Department's policies regarding employment, training and promotion of its handicapped employees and to inform me of any suggestions she may have.[34]

The Under Secretary's response was, obviously, rather perfunctory, undoubtedly because he believed that "these issues were not part of your original grievance" and that he therefore had no obligation to resolve them. Yet, on page three of his grievance, plaintiff had written:

> Executive Orders, Equal Employment Opportunity laws, CSC Directives, and Departmental policy statements ostensibly designed to establish the mechanisms, strategies and commitments to make EEO for the Physically Handicapped a reality *have been abandoned here in HUD.* It appears that the program devised to "Upgrade Employment and Career Opportunities for the Handicapped" was *fraudulent and perfunctory* in that it was designed merely to satisfy Federal

law and ease management's conscience. However, in my case it goes beyond the aspects of a *deliberately inoperative policy or program* . . . .[35]

Given these strong attacks on defendants' department-wide policy practices affecting the physically handicapped, the Court does not understand how the Under Secretary could conclude that issues of department-wide policy were not raised by the plaintiff. Moreover, the Under Secretary apparently ignored that which is often true of most types of employment discrimination: discrimination against an individual is often nothing more than the manifestation of the employer's attitudes toward the class of which that individual is a member. Even a narrow reading of plaintiff's grievance in this case makes it clear that he alleged that HUD's failures to meet its obligations toward the physically handicapped on a department-wide level were an essential part of the discrimination that plaintiff suffered as an individual. Given plaintiff's grievance, the Court believes it to be clear beyond peradventure that the Under Secretary had a duty to consider seriously the issue of department-wide policy toward the physically handicapped.

The Under Secretary's duty was augmented by the result of the proceeding before the Grievance Examiner. The Examiner found that, "[i]t appears that the Department never took cognizance of their legal responsibility toward a handicapped employee."[36] This was due "not so much [to] overt and hostile discrimination, but rather a failure by HUD to meet its obligations under statutes, policies, statements, the Federal Personnel Manual and other documents which relate to a Federal agencies [sic] responsibility toward handicapped employees."[37] His conclusions are amply supported by the record.[38]

---

34. Record, Exhibit 28.

35. Record, Exhibit 1 (emphasis added).

36. Record, Exhibit 15, p. 6.

37. *Id.* at 8.

38. For instance, testimony in the record indicates that as important an official as HUD's

Director of Personnel was not aware of any "specific programs just for handicapped people" in the department. Specifically, when asked if the Department had any "career development programs . . . available to handicapped employees once they become HUD employees," the Director answered that he was "not personally familiar with the area" and simply referred back to his earlier testimony

In light of the language of plaintiff's grievance and the findings of the Grievance Examiner, the Court concludes that the Under Secretary's failure to address the issue of department-wide policy toward the physically handicapped was "arbitrary [and] capricious," within the meaning of 5 U.S.C. § 706(2)(A).[39] The more difficult determination to make, however, is what the Court can and should do about the Department's failures. The Court believes that the current record at least raises the distinct possibility that HUD has failed to meet its obligations toward the physically handicapped. Plaintiff seeks to have the Court take an active role in supervising the development of HUD's program toward the physically handicapped. The department has, however, indicated in its most recent filing with the Court that it has begun an apparently major effort for "the development and administration" of "a new affirmative action program for the handicapped and the disabled veteran."[40] Whether this new effort signals a significant change for HUD or merely, as plaintiff contends, "an impressive list of promises and goals" which will be plagued by "a continued lack of follow-through"[41] remains to be seen. In light of this development, however, the Court believes that its role should be limited to requiring from HUD, within 120 days of the date of this Order, a comprehensive report detailing how it intends to meet its obligations under the statutes and regulations discussed in § II, *supra*. The Court will leave to the agency's discretion the choice of an appropriate agency official to prepare or supervise the preparation of the report. The report should be more than a mere catalogue of programs and regulatory provisions; it should concentrate on plans for the implementation of such programs and provisions. The report should be served upon plaintiff's counsel and made available to the public. If, after this report is completed, plaintiff continues to contend that defendants are not in compliance with the applicable statutes and regulations, he may then seek further judicial relief.

In the Court's view, this form of relief represents a minimal imposition on the agency. It is not the Court's intention to engage in detailed review or supervision of the agency's program. Given the agency's broad discretion in developing its program, any credible policy toward the handicapped will satisfy the agency's obligations under applicable law. Requiring the agency to prepare this report will hopefully accomplish one of two purposes: (1) if the agency is indeed in or near compliance with the law, a fact certainly not reflected in the record before the Court, the report will present an opportunity for the agency to so demonstrate; or, (2) if the agency is not in compliance with the law, the report will serve as a focus for, as the Grievance Examiner wrote, a necessary "candid introspection by HUD [leading to] the establishment of an honest affirmative action program which amounts to more than rhetoric

that he did not know of any programs specifically for the handicapped. Record, Exhibit 10, pp. 2–202 to 2–205. HUD's Deputy Assistant Secretary for Administration, to whom the Director of Personnel reports, also testified at the administrative hearing. Asked by the Grievance Examiner whether HUD's promotion policies apply "across the board regardless of any handicap an individual may have," the witness responded, "Yes. I don't know of any exceptions." *Id.* at 2–97 to −98.

**39.** The Court does not regard the Under Secretary's two brief comments on the issue, set forth above, as responsive in a meaningful way. The "response" that the Civil Service Commission had approved HUD's affirmative action program simply misses the thrust of plaintiff's charges of a "deliberately inoperative policy or program." As to the Under Secretary's request that the Assistant Secretary for Programs for the Elderly and the Handicapped "look into the Department's policies regarding employment, training, and promotion of its handicapped employees and inform me of any suggestions she may have," the Court is unaware of any suggestions made to the Under Secretary and any action taken as a result.

**40.** Affidavit of G. Eleanor Coleman, HUD Coordinator for Selective Placement, Defendant's brief of June 15, 1976.

**41.** Plaintiff's brief of June 24, 1976, in response to defendants' brief of June 15, 1976, at 2.

**1008**

and required submissions to the Civil Service Commission."[42]

## V. CONCLUSION

The Court will enter summary judgment for the plaintiff, although not on the precise terms requested. The Court will not award back pay to plaintiff, for the reasons set forth in § III. However, the Court will remand this case to the agency and require it to conduct a hearing on the question of plaintiff's possible entitlement to prospective promotion, as explained in §§ III and IV. The Court will not issue declaratory or injunctive relief applicable to plaintiff only, since such relief would seem to be unnecessary in light of the agency's effective admission of discrimination, as discussed in § IV. On the department-wide level, the Court will require the preparation of a report detailing how the agency is in compliance or plans to bring itself into compliance with these applicable statutes and regulations which set forth the agency's obligations toward physically handicapped employees.

---

**42.** Record, Exhibit 15, p. 11. The government suggests that the Court would violate at least the spirit of the Rehabilitation Act of 1973 by requiring preparation of a report from HUD. The government bases its position on the fact that the Act requires the Civil Service Commission to file an annual report with Congress on the "hiring, placement, and advancement of handicapped individuals" in the agencies. 29 U.S.C. § 791(d). Therefore, the government contends, "it is clear that the Civil Service Commission, and ultimately, Congress itself are to implement and supervise the implementation of the purposes of the 1973 Act. The role which plaintiff asks this Court to play is precisely the role which Congress explicitly retained for itself." Government's brief of Feb. 20, 1976, at 6 n. 2. In response, the Court makes two observations: First, the report which the Court will require will deal not merely with the Rehabilitation Act, but *all* of the statutes and regulations that create obligations toward the physically handicapped. In any case, this Court finds nothing inconsistent with a statutory scheme that provides for reports to Congress and which also lends itself to judicial review or supervision. For example, this Court has recently undertaken extensive review of certain regulations promulgated under the Marine Mammal Protection Act by the Secretary of Commerce, *see Committee for Humane Legislation v. Richardson,* 414 F.Supp. 297 (D.D.C.), *aff'd and remanded in part,* 540 F.2d 1141 (D.C.Cir. 1976), despite the existence of a similar statutory scheme which requires the Secretary to file annual reports with Congress, *see* 16 U.S.C. § 1373(f).